## THE ALICE

*(District Court, S. D. Florida.     June, 1882.)*

1. SHIPPING—BILL OF LADING—DAMAGES FOR NON-DELIVERY.

> Where but a portion of the cargo stated on a false bill of lading was actually shipped, and the owner of the vessel is not shown to have been a party to the fraud, the only damages to be found in an action *in rem* against the vessel are for the non-delivery of the cargo shown to have been put on board.

2. SAME—FRAUD—LIABILITY OF VESSEL—QUÆRE.

> Where the testimony *of the libellant* shows fraud on the part of the owner of the vessel in using false bills of lading, and also conclusively that but a small part of the cargo stated was ever shipped, can the vessel in an action *in rem* be held for the non-delivery of cargo more than is shown to have been received on board? *Quære.*

3. SAME—PRESUMPTION OF CONDITION OF GOODS.

Cargo is presumed to be shipped in good condition; and where the delay and dampness of the hold of the vessel are shown to have been sufficient to cause the damage found, if such delay has been unjustifiable, it is presumed to be the cause of loss and the vessel *held* liable.

4. NON-DELIVERY—MEASURE OF DAMAGES.

Where the voyage has not been completed and but scarcely commenced, and the cargo ruined by delay, the measure of damages for its non-delivery is its value at place of shipment and not at place of destination.

In Admiralty. Contract of affreightment.

*G. Bowne Patterson*, for libellants.

No claimant.

LOCKE, D. J. This is an action for damages for the non-performance of a contract of affreightment, in not carrying to their destination and delivering 524 bales of tobacco, appearing by a bill of lading to have been shipped on board this vessel at Santa Cruz, Cuba, for carriage to Falmouth, England, consigned to libellants, who advanced $11,662 upon it. Although due notice has been given by publication, no claimant has appeared, and the case has been heard *ex parte*. The master of the vessel, although present, has put in no answer, but has been called by the libellants and testified, but there has been no defence to the allegations of the libel other than comes from the testimony introduced by them.

The master testifies that some time in October the brig, with a cargo of lumber, cleared from New York for Cienfuegos, Cuba, consigned to Roca & Co., of Manzanillo. The only document which she had showing her ownership or nationality was a sea-letter, purporting to have been obtained from the Costa Rican consul at New York, in which B. J. Wenberg was represented as owner, and which certified that if said vessel visited a Costa Rican port within 12 months she would be entitled to documents as a vessel of such nation. After discharging at Cienfuegos she went to Santa Cruz, where Roca & Co. loaded her with a cargo consisting of mahogany, lance-wood, fustic, granadilla, honey, and tobacco, and she cleared ostensibly for Falmouth, England, for orders. Before sailing, R. B. Pender, who had been master from New York, resigned his place, representing that he was not well, and T. T. Partridge, former mate, was appointed master by the acting United States consul, and finally signed the bills of lading and cleared the vessel. He states that he did not know the contents of the bills of lading, as they were in Spanish, a language which he did not understand; but that he inquired of Mr.

Roca if they were all right, and upon being told that they were he signed them. He says he had no knowledge of that part of the cargo taken on board after he was appointed master, but presents a cargo book of that received by him while mate, showing a very much greater quantity of different kinds of wood than the bills of lading call for. He says he had no knowledge of the amount of tobacco received on board, but states that none had been removed from the vessel after she was loaded at Santa Cruz until discharged in this port. He further testifies that before sailing Roca, the consignee of the vessel and shipper of the cargo, told him that he wanted the brig sunk; that he would put augers on board, and wanted him, Partridge, to sink the vessel out at sea, and that he should have $3,000 from his agents in New York if he did it. A box, apparently made for the purpose, of red cedar, about three feet long, and three by four inches, securely nailed and lashed, marked "Mr. Pender, Santa Cruz," which has been opened in court and found to contain two large augers, is shown to have been sent on board by a gentleman in Santa Cruz, who had been on board the brig several times. Partridge testifies that Roca had been on board the brig several times, but none of the crew who saw the party bring the box to the boat knew either of the parties by name. It is shown by the testimony of the crew that it was brought to the brig's boat, then lying at the dock one evening, by the gentleman personally, passed into it, and taken on board by Capt. Pender. The augers are packed with a large number of custom-house blanks of an importing house at Manzanillo.

Partridge, the master, says that he replied to Roca, when told to sink the brig, that "it couldn't be done;" but Roca insisted that it must be; that he did not want the cargo to go to Europe. Partridge further says that he had no means to get home, and decided to remain in the vessel, take her to New York, and deliver her to the agents of Roca & Co. there; that he believed that Roca & Co. were her owners, although he had no proof of it; that he heard Roca say to Capt. Pender once that they had deposited $25,000 in, and that was about all gone; and, at another time, either that "he was not owner," or that "he did not want to be known as owner;" he could not say which. He had no other evidence as to who was owner of the vessel. After leaving Santa Cruz, the brig was 19 days reaching this port, where she came in for water on the fourteenth day of January. The master not being able to obtain funds to pay bills by his application to Wenberg, at New York, to whom he telegraphed,

remained, incurred expenses, had a part of his cargo sold, and finally, the term of shipment of his crew having expired, advised them that he could not pay them and that they would have to resort to the vessel, which they did, by libel. She has been sold, the crew's wages and other liens paid, and this action now stands against a residue in the registry of the court.

It appears, upon a final discharge of the cargo, that of the 524 bales of tobacco receipted for on the bill of lading there have been found but 62 bearing the proper marks, and these in a damaged and worthless condition. Portions of cargo upon other bills of lading have been found equally deficient.

I have been thus particular in stating the case fully as it is admitted by libellants that their position is sustained rather by circumstantial evidence than by any positive proof. There is no direct evidence of the number of bales of tobacco which went on board, as the testimony of the mate who took account of it as it came on board has not been obtained, any further than the testimony of the entire crew that it came along-side in a small lighter, and, together with 40 barrels of honey, was taken on board in between two and three hours; that the hatches were then fastened and battened down, and so remained until opened here in port; and that nothing was removed until it was regularly discharged here; that they neither went into any port nor spoke any vessel from the time of leaving Santa Cruz until they arrived at Key West. The statements of the entire crew, a very respectable and reliable appearing company of men, agree in this, and there is not a question or doubt in my mind of their truthfulness.

Experts have measured the vessel, and computed the dimensions of the cargo required to fill the bills of lading, and testify that in their opinion it would have been impossible for the vessel to have contained all the cargo that was in her, together with that which was shown on the bills of lading but not found.

There was on board in the bottom of the vessel 398 lance-wood spars, 241 logs of mahogany, 60 logs of cedar, and 133 pieces of granadilla more than is stated on any bill of lading; and these quantities, together with those on the bills of lading, correspond with the amount shown by the cargo book of Partridge to have been received on board; 1,139 bales of tobacco, 12 pounds of turtle shell, 45 tierces of honey, and 160 bales of matting covers, called for by the bills of lading, are not to be found. Either this quantity of cargo never went on board, or it was taken out and replaced by an entirely differ-

ent class of merchandise between the time of leaving Santa Cruz and arriving in Key West.

The cargo found in excess was also found in the very bottom of the vessel. Had the cargo originally corresponded with the bills of lading, to bring this excess in the bottom of the vessel would have necessitated a discharge of the entire cargo and a reloading. The probability of this would be very slight, even putting the positive evidence of the whole crew aside; but, when considered in connection with their testimony, it cannot for a moment be believed that the cargo appearing on the bills of lading was ever on board the brig; and that the bills of lading are fraudulent cannot be doubted.

The story of Partridge, that Roca desired the sinking of the vessel, while it might be doubted if standing alone and uncorroborated, when taken in connection with the discrepancy of the cargo, both explains and is explained by it.

A bill of lading is always *prima facie* evidence of the shipment of a cargo, but in this case the presumption of its truth is entirely overthrown, and in the absence of positive proof to the contrary the necessary conclusion is that there was only the amount of tobacco shipped under the bill of lading in question that was found on board having the corresponding marks, viz., 62 bales.

The libellants in their libel have alleged a contract between Roca & Co. and the master of the brig, and the shipment of the entire number of bales of tobacco as charged; but they have by their testimony shown conclusively that but 62 bales were shipped. They now claim, nevertheless, that Roca & Co. were owners of the vessel, and parties to the false bill of lading; that the deficiency in the amount of cargo shipped under it cannot be considered as in their favor, and, the general owner being a party to the fraud, the damages for the non-delivery of the 524 bales of tobacco should be found against the vessel. The general rule that the shipment of the cargo, under a bill of lading, is necessary to give it validity, and support an action *in rem*, is well established, (*The Freeman* v. *Buckingham*, 18 How. 182; *Vandewater* v. *Mills*, 19 How. 82; *Pollard* v. *Vinton*, 11 FED. REP. 351;) and until the question of ownership is determined it is not necessary to inquire how far the fraud of the owner, where proven by the libellants, may give a lien upon his vessel which will support an action *in rem*, or how far such general rule is changed or varied by the owner's fraudulent connection with the issuing of the bills of lading.

This vessel, while in New York, appears to have been Wenberg's. Partridge testifies that he was hired as ship-keeper and afterwards

as mate by him, and was paid by him for his services on board before sailing. The only document which the vessel is shown to have had, represented him as owner. On the other hand we have only the belief of Partridge, which he seems to find difficulty in tracing to any foundation in fact more than random remarks of Roca.

It seems that when in need of funds he first applied to Wenberg, and although the reply, which directed him to draw against his freight or on his owners, might raise a presumption of the ownership being in some one else, it is not conclusive. Nowhere do we find that Roca & Co. assumed control as owners; the new master was appointed by the consul, apparently without their knowledge, as Partridge states that he took the information of his appointment to them by a note from the consul. This would be proper and necessary in the way of business, were Roca & Co. but consignees, and the final approvement of the appointment would in no manner prove ownership.

It is also argued that Roca's attempt to have the vessel sunk as alleged would prove his ownership; but when the amounts which are shown to have been obtained on false bills of lading, and the character of the attempted fraud, are taken into consideration, it can readily be believed that the property in the vessel would be but a matter of small importance to one entering upon such a scheme. A subsequent suit for wages as mate brought by Partridge against them, in which it is alleged that they were owners both of the brig and the unclaimed portion of cargo, shows that it is for his interest that both vessel and cargo be found to belong to the same party. Considering the entire case, I am not satisfied that the proof of Roca & Co.'s ownership has been sufficient to justify such conclusion, and this view does away with the necessity of considering the question of the result of fraud in the owner.

In every case where the goods have been shown not to have been put on board, the bill of lading has been held to be void; and although I have found no case where the point has been decided, there appears to be no reasonable question but what the amount received, when a cargo shown by a bill of lading has been but partially laden, should be the measure of the liability of the ship; and the question is as to damages for the non-delivery of the 62 bales shown to have been received on board. It appears that the tobacco was taken on board the twenty-fourth of December. When examined here March 16th it was found damaged, and when examined again after being discharged, May 8th, utterly worthless. The several experts who have

testified to its condition agree that the length of time that it had been in the hold of the vessel has been sufficient to cause its present condition.

Cargo, when received on board, is presumed to be good until the contrary is shown, and this presumption is strengthened where the circumstances and time of its detention have been sufficient to produce any existing damage found. In this case, although no unseaworthiness of the vessel has been shown, yet that is not sufficient ground to find that, had the vessel pursued her course to the declared destination, the cargo might not have been delivered in due time in good order. The lapse of time, dampness of the hold, and heat of climate have combined to ruin it. The delay of the vessel in this port gave opportunity to two of these elements of destruction, and it must be held to have been the cause of loss. The present condition of the tobacco is shown to be such that no consignee could be obliged to receive it, and the true measure of damages is its actual value or prime cost at the place of shipment. The voyage had in no respect been completed, or its risks and uncertainties passed. The supreme court has held in several cases that, in considering the measure of damages for marine torts, probable profit on merchandise should not be taken into account, (*The Amiable Nancy*, 3 Wheat. 546; *La Amistad de Ruis*, 5 Wheat. 385; *The Appolon*, 9 Wheat. 362;) and such rule will apply with equal reason to a case of breach of contract against the property of ostensibly innocent parties. This cost appears by the testimony to have been after paying export duties, shipping charges, etc., about $22 per bale, or $1,364 in all, for which amount the decree will follow.

The prayer for allowance of agent's expenses and proctor's fees beyond the statutory amount, although apparently just in amount, must be disallowed, in accordance with the ruling of the supreme court. All of the cases referred to and relied upon on this point have been overruled since the enactment of the general fee bill. *Vide The Baltimore*, 8 Wall. 392; *Oelrichs* v. *Spain*, 15 Wall. 230; *Flanders* v. *Tweed*, Id. 453.