## THE GORDON CAMPBELL.

### (District Court, W. D. New York. October 21, 1905.)

1. SHIPPING—CONTRACT OF AFFREIGHTMENT—TIME OF PERFORMANCE.

   The general rule, in the absence of a clear agreement, as to when a vessel for hire shall proceed from her port of loading is that she is to deliver the goods carried or fulfill her engagement within a reasonable time.

   [Ed. Note.—For cases in point, see vol. 44, Cent. Dig. Shipping, §§ 399, 436, 459.]

2. SAME—DAMAGE TO CARGO—UNSEAWORTHY CONDITION OF VESSEL.

   Injury to a cargo of oats shipped from Chicago to Buffalo from becoming wet and heated between the time it was loaded and the time of delivery (which was over a month) owing to the vessel being delayed for repairs after loading, *held*, under the evidence, to have been due to her having been unseaworthy and not in good condition for the carriage of such cargo when the voyage was begun, owing to her defective decks and the careless handling of the pump during her detention, by reason of which water leaked through into the hold.

In Admiralty. Suit for damage to cargo.

Harvey L. Brown, for libelant.
William F. Carroll and Crangle & Burke, for respondent.

HAZEL, District Judge. This is a proceeding in rem against the steamer Gordon Campbell to recover damages to a cargo of clipped white oats, shipped by libelants in good condition at the port of Chicago, Ill. to Buffalo, N. Y. The elicited facts support the conclusion that the

owners of the cargo have shown by preponderating evidence that the carrying vessel the Gordon Campbell was in fault, in that it was not in a reasonably fit condition at the time of sailing, and, in consequence, her cargo of 80,000 bushels of oats, or a substantial part thereof, became heated or sweat-damaged. The charter, which was in writing, was made with the master of the steamship, and subsequently was ratified by the owner. It was a contract of affreightment, by which the vessel, in terms, became obligated to deliver the cargo in good condition, according to the reasonable import of the bill of lading. The words contained in the contract declaring that the steamer was "bound for Buffalo" if unexplained would seem to imply a readiness on the part of the vessel, wind and weather permitting, to immediately proceed on her voyage, and, under ordinary circumstances, the presumption would follow that at the time of the charter the vessel was prepared for sailing. A parol arrangement, however, by which it was plainly understood that the steamer was not completely fitted or prepared for sailing, in that she needed repairs to her machinery and boiler, and accordingly would be unable to begin her trip until the end of six or seven days, was concededly a part of the sailing contract. Such evidenced arrangement undoubtedly qualified the contract, and was a part thereof. Although the charter was dated on April 11, 1903, the Gordon Campbell did not finish repairing and get ready to sail for more than a month. She was loaded on April 12th, and began her voyage on May 10th, arriving at her destination on May 15, 1903. The delay was owing to the time necessarily spent after loading in fitting or preparing the vessel for the trip. The general rule, in the absence of a clear intention as to when a vessel for hire shall proceed from the port of loading, is that she is to deliver the goods carried or fulfill her engagement with ordinary promptitude and within a reasonable time. What constitutes a "reasonable time" is often difficult of ascertainment, but the principle is well settled, and needs no citation of authorities, that the conditions and attendant circumstances are controlling. The bill of lading in evidence does not indicate the time when the cargo was to have been delivered to the consignees, nor when the vessel should load or depart upon her voyage; nevertheless, the owner obligated himself, as already stated, to deliver the cargo with ordinary dispatch. If, after making the contract and loading the vessel, the owner, on account of unforeseen difficulties, should be unable to depart within a reasonable time, as he anticipated, it is his duty to notify the shippers, and either obtain a modification of the contract, or reship the goods, to the end that the agreement would be fulfilled with the least possible delay and injury. Broadwell v. Butler, Fed. Cas. No. 1,910; Davison v. Von Lingen, 113 U. S. 40, 5 Sup. Ct. 346, 28 L. Ed. 885; The Alice (D. C.) 12 Fed. 496.

Libelants contend that the facts indicate that the stipulated time of sailing was in five or six days after making the charter, and that such term was a condition precedent. The respondent claims, on the other hand, that the charterers had ample notice that the vessel required repairs to her machinery and boilers and other preparations for her departure. The exact length of time that it would take to finish such re-

pairs and fittings was not discussed. The record shows that, about two weeks after the vessel was chartered, and after she was loaded with the merchandise in question, the agent of the shippers inspected the cargo. It may be presumed, I think, that he had knowledge of the cause of her detention. An element of indefiniteness and uncertainty is apparent from the evidence, as a whole, as to the exact time which would elapse before the steamship could begin the trip; therefore, the surrounding circumstances were not such as to warrant the conclusion that time was of the essence of the contract. But this question is unimportant, for demurrage in consequence of the detention is not claimed. Consideration of the question of the vessel's delay is urged simply as bearing upon the asserted negligence and want of care in transportation.

This brings me to the next question, namely, whether the vessel at the beginning of the trip was unseaworthy in structure for the carriage of the cargo. Although the respondent claims that it rained or drizzled at different times during the loading of the vessel, I am satisfied by the proofs that the grain when stowed was in a reasonably fair condition, and that no injurious moisture got into the cargo at such time. It is undisputed that, on the arrival of the steamship at the place of unloading, about 2,229 bushels of oats, extending along the lower hold from the pump box near the fore bulkhead to the aft bulkhead near the engine room, and a quantity of oats aft in the fantail, were wet and in a caked condition. Neither is it controverted that a considerable quantity of grain underneath the hatches was warm or heated. The respondent chiefly relies upon the showing that the vessel was loaded in rainy, damp, or foggy weather, and that the cargo in consequence became heated, and not, as claimed, because of unseaworthiness. This reliance, however, is not supported by the evidence.

Upon the question of the unseaworthiness of the vessel, it appears that the deck near the windlass bulkhead was decayed and the oakum yielding. The pump was located on the main deck, near the windlass room, and the supply pipe reached to the keelson or to the bilge. The evidence indicates that, whenever the pump was used, the water which had collected in the bilges was spilt upon the leaky deck. During a part of the time that the ship was detained, a spout or trough six inches wide, made of wood, was used to conduct the water to the scuppers. This trough, however, was inadequate to carry the quantity of water pumped, for the evidence is open to the inference that the water splashed over the edges and leaked through the deck upon the cargo in the lower hold. When the trough was not used, the water was pumped upon the deck, and, as a large quantity of water collected in the bilges, it was necessary to frequently resort to the pump. An examination of the vessel was made by libelant's witness Clark immediately upon her arrival at Buffalo and before unloading. He testified that there was a continuous streak of wet or caked grain in the main hold at the bottom, extending about 120 feet from the fore bulkhead to the aft bulkhead near the engine room; that at the aft bulkhead, in the bottom of the vessel, he observed water from bilge to bilge, and that damage to the cargo in different places, on account of water and heating, was plainly perceivable. Other testimony in corroboration of this witness was given by libelants.

The other particulars of unseaworthiness claimed relate to the defective deck in the tiller room near the ice box, through which water is also claimed to have leaked on the cargo. The testimony is conflicting as to the source of the water. Some of the witnesses for respondent suggested that the water which damaged the grain was not that which was pumped from the bilges, but that when the vessel was unloaded she listed, causing the water in the bilges to run through the ceiling near the limbers, and thence into the cargo. The improbability of this statement, however, is quite apparent, for the heated condition of the cargo undoubtedly was induced by moisture from external causes other than rain, existing for a considerable time before the vessel was unloaded. Such a presumption is warranted from the caked and heated appearance of the cargo and from the defective decks and careless use of the pump, together with the delay in proceeding on the voyage, which enabled the moisture to permeate the cargo, in consequence of which it became heated. That water percolated through the grain on different occasions before the grain was unloaded is undeniable. Under the circumstances, the rule of law applies that a vessel is unseaworthy unless she is structurally fit and properly equipped to safely and securely carry the cargo she has undertaken to transport. The burden of proof was on the respondent to show the seaworthiness of the vessel and that she was in good condition at the beginning of the voyage. This he has not done. He has not explained the heated condition of the cargo on its arrival at the port of unloading, and, as it was received in good condition, the carrying vessel must be held responsible. Ins. Co. of North America v. North German Lloyd Co. (D. C.) 106 Fed. 973; The Edwin I. Morrison, 153 U. S. 199, 14 Sup. Ct. 823, 38 L. Ed. 688; The Caledonia (C. C.) 43 Fed. 681; The Patria (D. C.) 125 Fed. 425.

The stipulation in evidence shows that 2,229 bushels of grain were in such damaged condition as to render elevating the same impracticable. The libelants having refused to pay the freight, the damaged grain was sold, and the proceeds of the sale paid to the respondent. Such adjustment of freight, of course, does not affect the question of depreciation of the value of the balance of the cargo from heating.

Consideration of all the evidence induces the conclusion already intimated that the libelants are entitled to a decree. As no evidence was given of the sound value of the heated grain, or of the actual amount of the damages claimed to have been sustained, an order may be entered, with costs, referring the case to the clerk to assess such damages. So ordered.