### COHN et al. v. UNITED STATES SHIPPING BOARD et al.

Circuit Court of Appeals, Sixth Circuit.
June 6, 1927.

No. 4736.

1. United States ⏀125(2)—Shipping Board held not subject to suit for damages for delay in transporting cargo; "agency of United States."

United States Shipping Board, being an "agency of the United States," was not subject to suit for damages for delay in transporting cargo.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Agency.]

2. United States ⏀52½—Shipping Board Emergency Fleet Corporation. is liable for tort and breach of contract, as any other private corporation.

United States Shipping Board Emergency Fleet Corporation is subject to suit, and liable for tort and breach of contract, as is any other private corporation.

3. Shipping ⏀118—Contract for carriage by specified vessel, "or substitute," not stating sailing date, held to require transportation within reasonable time.

Contract for ocean carriage of goods by specified vessel, "or substitute," not fixing any date of delivery of goods to carrier, or of sailing of vessel, except for recital, "delivery as required by steamer, prompt delivery," held to require carrier to accept, transport, and deliver cargo to destination within reasonable time, in absence of any contract exemption.

4. Shipping ⏀118—Delay from February 28 and March 8, when carriage contracts were made, to May 6, when vessel arrived at shipping port, held unreasonable.

Delay from February 28 and March 8, when contracts for ocean carriage of cotton from New Orleans to Bremen, Germany, requiring transportation within reasonable time, were made, to May 6, when vessel arrived in New Orleans to take cargo, held unreasonable, unless carrier's withdrawal of vessel assigned to sail before such date was justified, or delay was excused under freight engagement contracts or bills of lading.

5. Appeal and error ⏀882(3)—Objection that excuse for delay in transporting goods was not pleaded is waived on appeal where case was tried and argued as though excuse were in issue.

Objection that excuse for ocean carrier's delay in transporting and delivering goods was not pleaded in the answer will be deemed waived on appeal, when case was tried and was argued in appellate court on theory that excuse was in issue.

6. Shipping ⏀132(5½)—Evidence held insufficient to show such conditions of war or hostilities at destination as would justify canceling sailing of vessel.

On libel in admiralty for damages resulting from ocean carrier's delay in transporting cotton from New Orleans to Bremen, Germany, evidence relating to revolution in Germany held to fall far short of showing conditions of war or hostilities endangering vessel on high seas, or interfering with safe landing at Bremen, so as to justify cancellation of sailing of vessel, under provisions of freight engagement contracts authorizing cancellation for such reasons.

7. Shipping ⏀141—To excuse performance of carriage contract, insurrection or hostilities must reasonably induce belief that voyage cannot be completed and delivery safely made.

To excuse ocean carrier from performing under freight engagement contracts, providing that sailing of vessels may be postponed or canceled if, in carrier's judgment, conditions of war or hostilities, actual or threatened, make it unsafe or imprudent for vessels to sail, there must be such a condition of insurrection or hostilities, actual or threatened, as would reasonably induce a belief in a prudent master or owner that the voyage could not be completed and delivery safely made at destination.

8. Shipping ⏀132(5½)—Evidence held to show that canceling of sailing of vessel was not caused by war or hostilities at destination, excusing performance of carriage contracts.

On libel in admiralty for damages resulting from ocean carrier's delay in transporting cotton from New Orleans to Germany, evidence held to show that canceling of sailing of vessel was not due to war or hostilities in Germany, under provisions of freight engagement contracts excusing performance of contract for such reasons.

9. Shipping ⏀141—Carrier, not returning cargo to shippers, held not relieved from liability for delay in transporting cargo under clause permitting cancellation or postponement of sailing date because of war.

Under ocean carriage contracts providing that sailing of vessels may be postponed and canceled if, in carrier's judgment, conditions of war or hostilities, actual or threatened, are such as to make it unsafe for vessels to sail, and relieving carrier from liability in such event, except to return cargo to shippers, carrier did not exercise the privilege by withdrawing vessel

without assigning any reason for so doing, and without returning cargo to shippers.

**10. Shipping ⬳118—Inability to procure full cargo held not to justify canceling sailing, evading liability for delay.**

Ocean carrier's inability to procure cargo for more than about 12½ per cent. of vessel's capacity *held* no excuse for canceling sailing of vessel, so as to avoid liability for delay in transporting cotton under contract requiring delivery within reasonable time; obligation being on carrier, and not on shipper, to procure full cargo.

**11. Shipping ⬳104—Carrier held not entitled to cancel carriage contract, so far as it imposed obligation on it, and hold cargo in order to keep or earn freight.**

Under carriage contract authorizing carrier to postpone or cancel sailing of vessel because of war or hostilities, making it unsafe for vessels to sail, and relieving carrier of further liability, except to return cargo to shippers, carrier was not entitled to cancel contract, so far as it imposed obligation on it, and hold cargo for purpose of keeping or earning freight paid or to be paid.

**12. Shipping ⬳140(1)—Bill of lading provisions exempting carrier from liability, where goods prevented from being sent by steamer designated are forwarded by succeeding steamers, are construed most strongly against carrier.**

Provision of bill of lading that, in case the whole or any part of the goods should be prevented in any case from going in steamer designated, shipowners are only bound to forward them by succeeding steamers and incur no further liability, and other similar provisions, are construed most strongly against the carrier.

**13. Shipping ⬳140(1)—Exemption from liability, if goods prevented from going in designated steamer are sent by others, held not to include wrongful cancellation or postponement of sailing.**

Provision of bill of lading exempting carrier from liability, if goods "prevented in any case from going in said steamer" are forwarded by succeeding steamers, *held* not to include wrongful cancellation or postponement of sailing, or breach of obligation to provide a vessel and transport cargo with reasonable promptness.

**14. Shipping ⬳118—Shipper's acceptance of carrier's delayed performance of ocean carriage contract held not waiver of right of action for damages.**

Shipper's acceptance of carrier's delayed performance of ocean carriage contract required to be performed within reasonable time *held* not a waiver of right of action for damages for a previous breach, where shipper had no other means of mitigating damages.

**15. Contracts ⬳316(6)—Acceptance of delayed performance is not inconsistent with, nor waiver of, right to damages for delay.**

Acceptance of delayed performance under contract is not inconsistent with a right to demand damages for delay, and hence is not a waiver.

**16. Shipping ⬳118—Where cotton was ready for delivery to carrier on March 30, reasonable time to start voyage from New Orleans to Germany held not later than May 1.**

Where cotton was ready for delivery to ocean carrier on March 30, under carriage contracts dated February 28 and March 9, reasonable time in which to start voyage from New Orleans to Bremen, Germany, could not be later than May 1.

**17. Shipping ⬳131—Shipper's damages for delay in transporting cotton held difference between market value when it should have been delivered and market value when delivered.**

Shipper's measure of damages for ocean carrier's delay in transporting cotton was difference between market value of cotton when it should have been delivered at destination, and time at which it was in fact delivered.

Appeal from the District Court of the United States for the Western District of Tennessee; Harry B. Anderson, Judge.

Libel by Robert Cohn and another, copartners under the firm name and style of Cohn & Ellett, and others, against the United States Shipping Board and the United States Shipping Board Emergency Fleet Corporation. Decree for libelees, and libelants appeal. Reversed and remanded for new trial.

Elias Gates, of Memphis, Tenn., for appellants.

Edouard F. Henriques, Sp. Asst. in Admiralty to Atty. Gen., of New Orleans, La. (S. E. Murray, U. S. Atty., of Memphis, Tenn., and J. Frank Staley, Sp. Asst. to Atty. Gen. in Admiralty, of Washington, D. C., on the brief), for appellees.

Before DENISON and MOORMAN, Circuit Judges, and WESTENHAVER, District Judge.

WESTENHAVER, District Judge. This cause is a libel in admiralty based upon alleged breaches of two certain contracts to furnish a ship and transport and deliver goods. Of the libelants, the real parties in interest are Cohn & Ellett, although their agents who made these contracts in their behalf are joined with them. On behalf of the respondents, the real party in interest is the United States Shipping Board Emergency Fleet Corporation, although the United States Shipping Board is also joined. In this opinion all parties will be disregarded except the true parties in interest. For purposes of brevity they will be referred to as libelant and respondent.

A statement of facts somewhat in detail is required in order to understand the questions presented for decision. Under date of

February 28, 1920, libelant contracted with respondent for freight space for 80 bales of cotton to be shipped "per S. S. Inspector or substitute, for Bremen, Germany, from New Orleans, La." No date is fixed for the delivery of the cotton to respondent, except as is implied from the words "delivery as required by steamer, prompt delivery." Under date of March 8, 1920, libelant made another contract with respondent for freight space for 300 bales of cotton to be shipped "per S. S. Saccarappa or substitute, for Bremen, Germany, from New Orleans, La." No date was fixed for the delivery of the cotton to respondent, except as implied from the words "delivery as required by steamer, prompt delivery within ten days." The words "within ten days" were added in pencil. Both contracts were made on behalf of respondent by its agent, the J. H. W. Steele Company, Inc. No question is raised as to the authority of the agent.

The two contracts are precisely the same mutatis mutandis. No date is fixed therein for the departure from New Orleans of either steamship or any substitute. No time is fixed within which the cotton was to be delivered at Bremen. The evidence shows that the usual length of time consumed in the ocean voyage between these two ports is 20 to 25 days. Both contracts are made subject to all the clauses and conditions of the ocean bill of lading on which the goods go forward, which bill of lading is also made a part of the contract. Both contracts are made subject to a certain condition reserving the right to postpone or cancel the sailing of any vessel and in that event to cancel the contracts. This reserved right of cancellation has become the basis of one important dispute. The terms of that clause and the circumstances of its asserted exercise will be later stated.

The cotton covered by the first contract was shipped from Memphis by Mississippi-Warrior River Section, United States Railroad Administration, on through bills of lading, giving Bremen, Germany, as destination with freight prepaid. No question is made as to the authority of the Railroad Administration to issue these bills of lading. They are two in number, dated March 6, calling for 82 bales, being evidently the shipment designed for the steamship Inspector. They arrived at New Orleans and were ready for delivery March 30. In the meantime the Inspector had, on March 9, sailed for Bremen. No contention is made by respondent that libelant did not make sufficiently prompt delivery of these 82 bales, or that the subsequent delay complained of was due to such

a failure. Libelant now makes no contention that the Inspector was obliged to await the arrival of those bales.

The cotton covered by the second contract was shipped in part from Memphis and delivered in part from warehouses at New Orleans. A total of 115 bales was shipped from Memphis over Mississippi-Warrior River Section, United States Railroad Administration, on similar through bills of lading, giving Bremen, Germany, as destination with freight prepaid. They are three in number, dated March 13. The cotton covered by them arrived at New Orleans and was ready for delivery to respondent's steamship March 24. Another lot, amounting to 185 bales, was delivered from warehouses at New Orleans on the wharf of respondent's agent at various dates between March 18 and 24. For these bales, two separate bills of lading were issued, bearing date March 24, but, under the undisputed evidence, not issued and delivered and freight paid until May 13. All of these bales, from the time of their arrival at New Orleans for delivery on respondent's wharf, were ready to be handed over to respondent at its pleasure.

When the Inspector sailed, the steamship Saccarappa was in New Orleans, assigned to sail on the Bremen route. She had arrived and docked March 6. She was taken off this service March 26, and put on a berth for Bordeaux-Dunkirk, and sailed on that route April 8. Thus it appears that all the cotton, except 82 bales, had arrived at New Orleans and was at the disposal of the respondent two days at least before the Saccarappa was withdrawn from the Bremen route, and that as to the 82 bales they had arrived and were ready for delivery eight days prior to such sailing. At the time the Saccarappa was so withdrawn, respondent had no other steamer available as a substitute, and no prospect of getting one for an indefinite period in the future. In point of fact, the steamship next obtained by the respondent was the Newburgh, which did not leave Norfolk, Va., until April 26, and did not arrive in New Orleans until May 6.

The entire lot of 382 bales was loaded on the Newburgh between May 10 and May 18. At the time the cotton was so loaded, the Newburgh was not in condition to put out to sea. Upon her arrival it was discovered that substantial repairs were necessary in order to put her in a seaworthy condition. No objection was made by libelant to the loading of the cotton at this late date. It is claimed by respondent that, when such loading took place, it believed, with good reason, that the

repairs could be made contemporaneously and the vessel gotten ready for the voyage within a reasonable time. However, on May 18, the machinists' union in New Orleans began a strike, which prevented the completion of these repairs until the latter part of July, and even prevented the unloading of the cotton. As soon as the strike was broken, the repairs were promptly completed, and on August 2 the Newburgh sailed, and on August 26 arrived at Bremen. In the interval between May 1, the approximate date when the cotton would have arrived at Bremen if the Saccarappa had sailed as contemplated, the market price of cotton had heavily declined, both in the Bremen and the New Orleans market.

Libelant's action is to recover damages for this delay. The chief item of damage is this decline in market value. Libelant's theory is that the two freight engagement contracts contemplated reasonably prompt, if not an immediate, sailing of the Saccarappa or some substituted ship, and a reasonably prompt transportation and delivery of the cotton, and that these contract obligations were broken, first, by a wrongful cancellation of the sailing of the Saccarappa without provision within a reasonable time of a substitute ship; and, second, that the respondent wrongfully loaded the cotton on the Newburgh while she was in an unseaworthy condition, and under such circumstances that the respondent knew or should have known that she could not be put in a condition to sail within a reasonable time. The defenses, and the facts on which they are rested, will appear in the course of this opinion. We shall discuss at length such propositions only as are deemed necessary to a disposition of the case.

[1] 1. Respondent excepted to the libel on the ground that the United States Shipping Board was improperly made a defendant. It urges that this board is a commission and agency of the United States, and is not subject to suit. This exception was overruled below, apparently because of a failure to distinguish between the Shipping Board and the United States Shipping Board Emergency Fleet Corporation. In our opinion, the United States Shipping Board is not subject to suit, and the exception should be sustained. [2] 2. The respondent, in its answer, makes the point that the United States Shipping Board Emergency Fleet Corporation is not subject to suit, because it was designated by the United States Shipping Board as a division for operating vessels owned by the United States, and was functioning, not in its corporate capacity, but as a governmental agency. Neither in counsel's brief, nor in oral argument, was this point stressed, nor is any question raised as to the jurisdiction of the District Court in which the libel was filed. It has been held in a long series of cases, both on contract and on tort, that the Emergency Fleet Corporation is subject to suit and liable for tort and breaches of contract as are other private corporations.[1]

[3] 3. Upon the merits, the controlling question turns on the obligation, if any, imposed by the two freight engagement contracts upon respondent to ship the cargo on the Saccarappa, or some substitute ship, with reasonable promptness. This involves an inquiry into the nature of the contract obligation entered into by the parties and the excuses advanced by respondent for its withdrawal of the Saccarappa from the Bremen route and its failure to provide a substitute ship within a reasonable time. As already stated, the contracts bear no date when either the Inspector or the Saccarappa would sail, or within which any ship substituted for them would sail. Hence, except for the conditions later to be stated, advanced in excuse, it became the obligation of the respondent to accept, transport, and deliver the cotton to its destination within a reasonable time. Having entered into a contract of ocean carriage, it assumed, in the absence of any contract exemption, an obligation to provide a vessel to perform that contract within a reasonable time, and is liable in damages for its failure so to do, unless it is excused by some term of its contract or by some principle of law.

The law to this effect seems to be well settled. In Dietrich v. U. S. S. B. Emergency Fleet Corp'n (2 C. C. A.) 9 F.(2d) 733, 741, it is said: "In the absence of any agreement to the contrary, a shipper may claim damages if the ship delays unreasonably in sailing, or beyond the agreed time, if any; and, in the absence of agreement to the contrary, delivery of goods shipped must be made

[1] See Sloan Shipyards Corp'n v. U. S. S. B. Emergency Fleet Corp'n, 258 U. S. 549, 42 S. Ct. 386, 66 L. Ed. 762; Providence Engineering Corp'n v. Downey Shipbuilding Corp'n (2 C. C. A.) 294 F. 641; Smith v. U. S. S. B. Emergency Fleet Corp'n (D. C.) 2 F. (2d) 390, 392; U. S. S. B. Emergency Fleet Corp'n v. Banque Russo-Asiatique London (3 C. C. A.) 286 F. 918; Dietrich v. U. S. S. B. Emergency Fleet Corp'n (2 C. C. A.) 9 F. (2d) 733, 738; U. S. S. B. Emergency Fleet Corp'n v. Rosenberg Bros. & Co. (9 C. C. A.) 12 F. (2d) 721; U. S. S. B. Emergency Fleet Corp'n v. Texas Star Flour Mills (5 C. C. A.) 12 F. (2d) 9.

within a reasonable time." In the opinion is quoted with approval the following statement from Carver on Carriage of Goods by Sea (6th Ed.) § 179: "But, apart from these considerations, one general rule may be said to govern the performance of the contract, viz. that it must be performed in a reasonable manner and with reasonable dili-gence on each side. Where the manner or place of doing an act, or the time at which or within which it is to be done, is left undefined, it is to be determined by reference to what is reasonable, having regard to the circumstances of the particular case."

In R. B. Boak v. U. S. S. B. Emergency Fleet Corp'n (5 C. C. A.) 11 F.(2d) 523, it was in effect held that if the contract is one to carry on a particular ship,. or if the particular ship is to sail within a given period of time, the contract is broken if the goods are not carried on the agreed ship, or if the sailing is delayed beyond the agreed date. In U. S. S. B. Emergency Fleet Corp'n v. Texas Star Flour Mills (5 C. C. A.) 12 F. (2d) 9, the contract under review was one merely engaging freight space, without specifying any ship or fixing any approximate date of sailing, and it was held that the carrier was liable for failing to remove the flour from the cars with reasonable promptness, and for unreasonable delay in shipping and delivering it at the port of destination. See, to the same effect, the following: The Prussia (D. C.) 100 F. 484; The Gordon Campbell (D. C.) 141 F. 435.

The obligation to provide a steamship, imposed by a contract to transport and deliver a cargo, arises by implication, if not expressly agreed, upon the same principle as is implied the obligation of an owner to provide the building site when entering into a contract with another to build a building for him. Compare Bates & Rogers Construction Co. v. Board (D. C.) 274 F. 659; Guerini Stone Co. v. Carlin Construction Co., 248 U. S. 334, 340, 39 S. Ct. 102, 63 L. Ed. 275. [4] Respondent did not ship the goods on the Saccarappa, nor a substitute ship, within a reasonable time after making its contracts. In our opinion, the delay which ensued between the date of these contracts and the arrival of the Newburgh at New Orleans was unreasonable, and respondent must be held liable, unless its withdrawal of the Saccarappa was justified, or unless the respondent is excused under some provision of the freight engagement contracts or the bills of lading.

[5] 4. The main ground of excuse here urged is based on a provision of the freight engagement contracts cited in the margin.[2] This excuse was not pleaded in the answer, but, as the case was apparently tried below and argued here on this theory, we shall regard any objection to its consideration as waived.

[6] Respondent urges the political disturbance or insurrection in Germany, sometimes called the Kapp revolution, as a condition of war, or hostilities, actual or threatened, such as to make it unsafe or imprudent for the Saccarappa to sail, and hence it was excused in withdrawing the Saccarappa from the Bremen route. In our opinion, this contention is not sustained. In addition thereto, it appears that respondent did not exercise its reserved right of cancellation in accordance with this provision of the contracts.

The so-called Kapp revolution, as shown by the evidence, began March 13, 1920. It appears to have been an internal political disturbance, with all demonstrations of a belligerent nature confined to Berlin and its environs. Its leaders abandoned the enterprise March 17. The insurgent battalions supporting Kapp withdrew from Berlin March 18 and were replaced upon that date by government forces. By March 24, all work and traffic were resumed, and the National Assembly again met in Berlin. The suspension of work and traffic was due, not so much to the disturbance, as to a general strike called to suppress it. The report of the American commissioner at Berlin is that order was restored, the insurrection suppressed, and all difficulties composed by March 21. It does not appear that Bremen or that part of Germany was involved in the insurrection. The evidence falls far short of showing conditions of war or hostilities such as would hazard the safety of the Saccarappa on the high seas or interfere with the safe landing and delivery at Bremen.

[7] It is deemed unnecessary to consider

---

2 "This contract is made subject to conditions of Act of Congress governing bills of lading; approved February 13, 1893, and is further conditional upon the continuance of the steamship company's service and the sailing of its steamers, and if at any time in the judgment of the steamship company conditions of war or hostilities, actual or threatened, are such as to make it unsafe or imprudent for its vessels to sail, the sailing of any vessel or vessels may be postponed or canceled; and in that event, or in event of requisitioning of the steamer assigned to lift the goods covered by this contract, the steamship company may, at its option, cancel this contract and shall be relieved thereafter from any liability hereunder except to return to the shippers whatever cargo may have been already received under this contract."

carefully the proper construction of the language in question, or what conditions of war or hostilities would excuse performance and justify cancellation. It is sufficient to say that there must have been such a condition of insurrection or hostilities, actual or threatened, as would reasonably induce a belief in a prudent master or owner that the voyage could not be completed and delivery safely made at the point of destination. See The Kronprinzessin Cecilie, 244 U. S. 12, 37 S. Ct. 490, 61 L. Ed. 960; Id. (1 C. C. A.) 238 F. 688; 2 Williston on Contracts, § 1092; Northern Pacific Ry. Co. v. American Trading Co., 195 U. S. 439, 25 S. Ct. 84, 49 L. Ed. 269.

[8] Nor does it appear that the sailing of the Saccarappa for Bremen was canceled because of conditions of war or hostilities, actual or threatened, such as made it unsafe or imprudent to sail. She was not withdrawn from the Bremen route until March 26, after the insurrection was completely suppressed and order fully restored, and advices to that effect were in possession of the State Department at Washington. She did not in fact sail from New Orleans until April 8. In the meantime the Inspector, which had left New Orleans on March 9, was sent forward to Bremen out of Norfolk on March 30, despite the insurrection. The conduct of the respondent at the time repels any inference that it was believed in good faith to be unsafe or imprudent for the Saccarappa or any other vessel to sail for Bremen.

[9] Even if respondent had in good faith believed it unsafe or imprudent because of war or hostilities for the Saccarappa to sail for Bremen, it did not exercise the right reserved by the contract to postpone or cancel the sailing, and in that event cancel its contracts and be relieved from all liability, except to return the cargo, as is therein provided. The privilege is to cancel. the contract and return the cargo, if the sailing is for that reason postponed and canceled. The respondent did not exercise this right. It withdrew the Saccarappa without assigning any reason for so doing. It was not until April 10, in response to a complaint from libelant, that it says: "At the time the steamer was named, we were confident of booking a full cargo, but unfortunately a revolution was started in Germany and most of the shippers that engaged space on this steamer got cold feet and canceled their bookings, leaving us only 1,800 bales on our wharf, and, as the Saccarappa is a 15,000 bale cotton steamer, you can see our reasons for withdrawing the steamer."

[10] The obligation was on respondent and not on the libelant to furnish the cargo. See 1,600 Tons Nitrate v. McLeod (9 C. C. A.) 61 F. 849. Nor were the freight engagement contracts made conditional upon respondent being able to obtain a full cargo. Respondent attached so little importance to this excuse that it neglected even to plead it in its answer. We are obliged to dismiss it from consideration as a pure afterthought.

[11] Nor did respondent, upon withdrawing the Saccarappa, attempt to cancel the contract and relieve itself from further liability, except to return the cargo. At that date, 185 bales were lying on its agent's wharf at New Orleans; 115 bales had already arrived from Memphis under through bills of lading, with freight already paid; 82 bales, freight prepaid, arrived a few days later, but eight days before the Saccarappa sailed. Respondent was not at liberty to cancel, in so far as it imposed an obligation upon it, and hold onto the contract for the purpose of keeping or earning freight paid or to be paid.

[12] 5. Respondent's answer, paragraph 11, pleads in excuse certain provisions of the bills of lading. Certain of these provisions relate to restraint of princes, rulers, and people. Upon the facts, these provisions become immaterial. See Williston on Contracts, § 1092. Another provision so pleaded is as follows: "Also that in case the whole or any part of the goods specified herein be prevented in any case from going in said steamer * * * shipowners are only bound to forward them by succeeding steamers of this line and incur no further liability." This provision is found only in the two bills of lading issued for the 185 bales delivered from the warehouse at New Orleans. Provisions of this nature in a bill of lading are construed most strongly against the carrier. See The Caledonia, 157 U. S. 124, 15 S. Ct. 537, 39 L. Ed. 644.

[13] We deem it unnecessary to consider carefully what may be included by the words "prevented in any case from going in said steamer." We are of opinion that they do not include wrongful cancellation or postponement of sailing, or a breach of the obligation to provide a steamer and transport and deliver the cotton with reasonable promptness. Other provisions of the bill of lading, pertaining to delays due to strikes, now stressed in argument, although not pleaded, are pertinent only to the delay of the Newburgh to sail, which, in view of the conclusion to which we have come, we deem it unnecessary to consider.

[14] 6. Respondent urges that libelant is barred from recovering because he later, without objection, permitted the cotton to be loaded on the Newburgh. In our opinion, an acceptance of delayed performance, under the circumstances, is not to be regarded as a waiver of a right of action for damages for a previous breach. Libelant was practically helpless, and had no available means of mitigating the damages arising from the previous breach. Part of the cotton was lying on respondent's wharf. The rest of it was upon the barges of the initial carrier, received under a through bill of lading, and ready to be delivered to respondent at its pleasure. So far as appears, libelant's best way to mitigate its damage was to accept the delayed performance.

[15] The general rule is that acceptance of delayed performance under a contract is not inconsistent with the right to demand damages for the delay, and hence is not a waiver. We perceive no reason why this rule should not be applied. It was applied in R. B. Boak & Co. v. U. S. S. B. Emergency Fleet Corp'n, supra, to a case in which the carrier by steamship had broken its contract to transport and deliver with reasonable promptness. For cases applying the rule to other contracts, see Gerber v. Borderland Coal Sales Co. (6 C. C. A.) 5 F.(2d) 278; Frankfurt-Barnett Co. v. Prym (2 C. C. A.) 237 F. 21, L. R. A. 1918A, 602. The rule has also been often applied in building contract cases, where the owner is guilty of a breach in failing to provide the site, or to furnish adequate plans and specifications, notwithstanding the contractor, after discovery of such breach, has proceeded with the performance of the contract and accepted pay for the work done. See City of Lima v. Farley (6 C. C. A.) 7 F.(2d) 40; Hollerbach v. United States, 233 U. S. 165, 34 S. Ct. 553, 58 L. Ed. 898; Christie v. United States, 237 U. S. 234, 35 S. Ct. 565, 59 L. Ed. 933; United States v. Dredging Co., 253 U. S. 1, 40 S. Ct. 423, 67 L. Ed. 735.

[16] 7. These conclusions render unnecessary a consideration of the numerous contentions made with respect to the Newburgh. If respondent had not broken its contract, the cotton would have gone forward at a date earlier than the arrival of the Newburgh at New Orleans. In our opinion, a reasonable time within which to start the voyage of transportation could not be later than May 1. Inasmuch as libelant is entitled to recover because of this breach, and cannot be held to have waived its right to damages by acceptance of delayed performance tendered by the Newburgh, it becomes immaterial to inquire whether respondent's conduct was wrongful in loading the cotton aboard the Newburgh, or is excused for the delays thereafter ensuing.

8. The decree of the court below must be reversed. It is not proper, however, now to enter a final decree. The trial below was so conducted that respondent did not present fully its evidence upon the question of damage. It should be given the opportunity so to do before the damages are assessed and a final decree entered.

[17] One of the questions pertaining to the proper measure of damages discussed here will arise upon a new trial and ought now to be determined. Libelant's major item of damage is the difference in the market value of the cotton at the time it should have been delivered at Bremen and at the time at which it was in fact delivered. The cotton arrived in sound condition, but the market price between those dates had heavily declined. Respondent urges that fluctuations in the market value are not recoverable under maritime contracts for transportation of goods. It is our opinion that the libelant is entitled to recover the difference in market value. This conclusion is supported by The Caledonia, 157 U. S. 124, 139, 15 S. Ct. 537, 39 L. Ed. 644; Carver on Carriage of Goods by Sea, § 726; United States v. Middleton (4 C. C. A.) 3 F.(2d) 384, certiorari denied 267 U. S. 604, 45 S. Ct. 463, 69 L. Ed. 809; The Styria (2 C. C. A.) 101 F. 728. The authorities bearing on this proposition are so fully reviewed, and the reasons supporting the conclusion so carefully stated by Circuit Judge Rose in the Middleton Case, that we deem it unnecessary to go over the same ground. It is sufficient to say that we concur in his reasoning as well as in his conclusion.

The decree of the court below is reversed, and the cause remanded for a new trial in accordance with the principles herein stated. Appellant will recover full costs in this court.