## THE KRONPRINZESSIN CECILIE.[1]

CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE FIRST CIRCUIT.

No. 922.  Argued April 16, 17, 1917.—Decided May 7, 1917.

Upon the facts stated in the opinion, *Held*, that the master and owners of the German Steamship "Kronprinzessin Cecilie" were justified in apprehending that she would be seized as a prize, and her German and other passengers detained, if she completed her voyage to Plymouth and Cherbourg on the eve of the present war; that return to this country before Plymouth was reached was a reasonable and justifiable precaution; and that libelants have no cause of action for failure to deliver their shipments of gold at those ports, although, *semble*, the risk did not fall within the exception of "arrest and restraint of princes, rulers or people" expressed in their bills of lading.

In an ordinary contract of carriage, not made in the expectation that war may intervene before delivery, peril of belligerent capture affords an implied exception to the carrier's undertaking, the contract being silent on the subject.

The court rejects the argument that although a shipowner may give up the voyage to avoid capture after war is declared he is never at liberty to anticipate war; and holds that where war is reasonably and correctly anticipated, liability for non-delivery of freight can not depend upon a nice calculation that delivery might have been made and capture avoided if the voyage had gone on.

238 Fed. Rep. 668, reversed.

---

[1] The docket title of this case is: *North German Lloyd, Claimant of the Steamship "Kronprinzessin Cecilie," Petitioner*, v. *Guaranty Trust Company of New York and National City Bank of New York*.

THE case is stated in the opinion.

*Mr. Joseph Larocque* and *Mr. Walter C. Noyes*, with whom *Mr. Joseph D. Bedle* was on the brief, for petitioner:

The case is indistinguishable from *The Styria*, 186 U. S. 1. In that case and in *Nobel's Explosives Co.* v. *Jenkins* (1896), L. R., 2 Q. B. 326, the masters acted under orders from their owners which were just as peremptory as the order received by Captain Polack in this case. In this case as in those the action taken was in accordance with master's independent judgment. In the *Styria Case* there was no actual restraint or danger, either existing or *in futuro*.

Justification of the ship's return did not depend on the existence of an actual state of war. *The Styria, supra; The Teutonia* (1872), L. R., 4 P. C. 171.

If the officers and directors of a corporation which owns a ship owe a duty to passengers, crew and cargo, as well as to the ship itself, to use modern means of communication to inform the master of impending dangers which come to their knowledge, such duty must carry with it a corresponding right. If the duty be to protect the different interests from threatening danger, then, when the duty is performed, liability cannot grow out of the performance of it. Such officers and directors in these days of wireless telegraphy may owe the duty of taking even peremptory action for the protection of all interests. But if they do owe such duty, and exercise their best judgment, they are entitled to the benefit of it. Every consideration which makes the judgment of the master controlling as relating to all interests must operate to give the same effect to the judgment of the owner, when he is required to act for the protection of all.

To exonerate the ship it was not essential that both ship and cargo be exposed to a common peril.

The German cargo owners and the German and Austrian passengers and members of the crew were entitled to just as much consideration as were the Guaranty Trust Company and National City Bank. *The Teutonia, supra; The San Roman* (1873), L. R., 5 P. C. 301. The uniform course adopted by all German shipowners in issuing warnings to their ships on July 30th and 31st, 1914, is in itself a clear indication that the interruption of the Cecilie's voyage was fully justified.

The order received by wireless from the Imperial Marine Office may, in itself, be considered a restraint. At least, it shows that in the opinion of the German Government, English, French and Russian ports would not be safe for German vessels on and after August 1, 1914, and, therefore, constitutes authoritative and conclusive proof of the wisdom of Captain Polack's course.

The majority of the Circuit Court of Appeals have confused principles which are peculiar to the law of marine insurance with those which are applicable to cases arising under bills of lading.

Policies of insurance are contracts of indemnity. To warrant a recovery under a policy covering arrest and restraint of princes, etc., it is not sufficient to show that the subject of insurance was in danger of loss, or that a loss was actually sustained through fear of a peril insured against, or in attempting to avoid such peril. The peril insured against must have operated directly upon the subject of insurance. See *Olivera* v. *Union Ins. Co.*, 3 Wheat. 183; Phillips on Insurance, vol. 1, § 1114. This rule is largely aimed at fraudulent and factitious claims of constructive loss. *Hadkinson* v. *Robinson*, 3 Bos. & Pul. 388. It is based also on the consideration that the thing insured is not totally destroyed. *Ibid.*

A bill of lading constitutes the contract between the shipper and carrier, and where the latter undertakes to exercise reasonable care to prevent a loss from an excepted

peril, there is a corresponding assent by the former that the carrier may adopt reasonable precautions to avoid such peril.

It would be an absurdity to hold that the performance of a duty creates a liability for damages.

In the case of a bill of lading, even though the excepted peril be the proximate cause, this will not protect the carrier if the negligence of his servants be a contributing cause, nor if after a loss without such contributory negligence they fail to take reasonable care to minimize the damage. In the latter case the carrier will be responsible for the increased damage although not liable for the original damage. It being the duty of the carrier not to expose the shipper's goods to a restraint, he incurs no liability by performing this duty, even if the precautions adopted involve a deviation from his course.

The true rule is as follows: A reasonable apprehension of capture or other imminent peril justifies a master in deviating from his direct course and taking such steps as a prudent man would take for the purpose of avoiding danger, and in so doing he is entitled to consider the safety of his ship as well as the cargo, and the safety of the belligerent as well as of the neutral cargo. *Nobel's Explosives Co.* v. *Jenkins, supra; Pole* v. *Cetovich* (1860), 9 C. B. (N. S.) 430; *The Teutonia* (1872), L. R., 4 P. C. 171, 179; *The San Roman, supra*, p. 306.

The libelants are not entitled to a refund of the prepaid freight.

*Mr. J. Parker Kirlin*, with whom *Mr. Charles R. Hickox* was on the brief, for the Guaranty Trust Company of New York:

The Kronprinzessin Cecilie was a common carrier, liable as an insurer for failure to deliver the libelant's gold in England unless excused by the terms of the bill of lading. *Liverpool Steam Co.* v. *Phenix Ins. Co.*, 129 U. S. 397;

*Propeller Niagara* v. *Cordes*, 21 How. 7, 22; 1 Parson's Ship
& Adm., p. 171; Moore on Carriers, p. 306.

The failure to complete the voyage and deliver the cargo
is not excused by restraint of princes or other exceptions
in the bill of lading. The voyage was not abandoned
because of "arrest and restraint of princes." The master
received specific and definite orders from his owners to
turn back. This message was designedly false in its state-
ment of fact, for war had not broken out between Ger-
many and England, France or Russia, or between any two.
The master accepted the message as an order and acted
accordingly. His testimony shows that unless and until
he received the order from the owners he never intended to
abandon his voyage. The exception of "enemies" and
"arrest and restraint of princes," is found in juxtaposition
with other exceptions dealing with loss or damage caused
by violence or by uncontrollable forces. It is, of course,
to be construed as *ejusdem generis* with the other ex-
cepted causes; that is, it is to be limited to actual arrests
and restraints by force, or to steps taken to avoid the
reasonable certainty of an arrest and restraint by force,
in case the voyage should be continued. In *The Styria*,
186 U. S. 1, the exception was merely "restraints of
princes." Having been introduced into the contract by the
shipowners, the exception is to be construed against them.
*The Caledonia*, 157 U. S. 134, 137; *Compania* v. *Brauer*,
168 U. S. 104, 118; Carver, Carriage by Sea, 5th ed., § 77.

Recalling the vessel and abandoning the voyage from
fear or in the expectation that war might break out is
quite a different thing from taking such a step to escape
the moral certainty of an arrest and restraint.

An arrest involves an actual seizure by hostile forces.
*Olivera* v. *Union Ins. Co.*, 3 Wheat. 183, 189. A justifiable
fear may be equivalent to an actual arrest but only in such
cases as *Nobel's Explosives Co.* v. *Jenkins* (1896), 2 Q. B.
326, where arrest was a practical certainty. The law in

America is clear that a defense, based on an exception of "arrest and restraint of princes," where there is no actual arrest, must establish a danger of capture that was imminent, apparently remediless and morally certain. *Craig* v. *United Insurance Co.*, 6 Johns. 226; *Corp* v. *United Insurance Co.*, 8 Johns. 277; *Oliver* v. *Maryland Insurance Co.*, 7 Cranch, 487; *Smith* v. *Universal Insurance Co.*, 6 Wheat. 176; *Richardson* v. *Maine Ins. Co.*, 6 Massachusetts, 102.

While these cases arose under policies of insurance, the clause of restraint of princes received the same construction that would be given to it in a charter party or bill of lading. *The Xantho* (1887), L. R., 12 App. Cas. 503; *Hamilton* v. *Pandorf* (1887), L. R., 12 App. Cas. 518; *The G. R. Booth*, 171 U. S. 450. In case of a deviation to avoid an arrest the shipper must be able to recover his loss either from his insurer, on the ground that the certainty of arrest which is thus avoided is equivalent to an actual arrest within the meaning of his policy, or from the carrier on the ground that the danger was so remote and uncertain that the deviation was not justified. 1 Parson's Ship. and Adm., p. 172.

The law in England on the subject accords completely with the decisions in our courts. *Hadkinson* v. *Robinson*, 3 Bos. & Pul. 388; *Forster* v. *Christie*, 11 East, 205; *Atkinson* v. *Ritchie*, 10 East, 530; *Nickels* v. *London & Provincial Marine & General Insurance Co.*, 6 Com. Cases, 15; *Kacianoff* v. *China Traders Insurance Co.* (1914), 3 K. B. 1121; *Becker* v. *London Assurance Corporation* (1915), 3 K. B. 410, affirmed (1916), 2 K. B. 156; *Mitsui* v. *Watts, Watts & Co.* (1916), 2 K. B. 826, affirmed by House of Lords March 16, 1917.

The directors were not justified in speculating on the future and assuming that war would break out. *Janson* v. *Driefontein* (1902), A. C. 484, 497, 498; *People* v. *McLeod*, 25 Wend. 483.

In making this shipment on a German rather than a British steamer it cannot be said that the libelant assumed any risk other than in accordance with the terms of the bill of lading. It must be inferred that both parties expected that the contract would be completely carried out unless in the happening of contingencies mentioned in the bill of lading that might prevent performance. It is not to be presumed, in the absence of all evidence, that either France or England would have committed the hostile act of attempting to arrest and detain this German vessel before a state of war between them and the German Empire existed. *Prinz Adalbert*, the *Kronprinzessin Cecilie*, 1916, 32 Times L. R. 378. The liability of the petitioner is to be determined by the posture of affairs that existed. *The Savona* (1900), Prob. 252, 259. The claimant has been unable to produce any proof that the vessel could not have completed the voyage without the intervention of any excepted peril. On the contrary there is no reason on this record to doubt that if the steamer had proceeded on her voyage, she would have reached Plymouth, discharged her cargo, and left in safety.

The abandonment of the voyage would not have been justified if it resulted from an exercise of the master's discretion. If the master can be considered as having exercised any discretion or concurred in judgment with what the owners ordered, it could only be on the assumption that the facts given to him by the owners, in their message, were true. They deliberately told the master a falsehood because they did not dare to rely on his discretion if they told him the truth. The owners' hands are not clean in the matter and they should not be permitted to gain any benefit from their own wrong. *King* v. *Delaware Insurance Co.*, 6 Cranch, 74. The owner cannot justify its order by assuming there was a shortage of coal. The duty of supplying the vessel with a sufficient

quantity of coal for the expected contingencies of the voyage in all its stages was on the shipowner. *The Vortigern* (1899), Prob. 140; *Thin* v. *Richards* (1892), 2 Q. B. 141; *McIver* v. *Tate Steamers* (1903), 1 K. B. 362; *Greenock S. S. Co.* v. *Maritime Ins. Co.* (1903), 2 K. B. 657.

The possibility of increased political tension must have been in the owners' minds when the vessel sailed, and they were bound to supply sufficient coal to meet such expected contingencies.

The master had no general discretion to deviate from the voyage except under the compulsion to avoid an excepted peril, imminent, pressing and which had begun to operate. *Morrison* v. *Shaw S. & A. Co.* (1916), 1 K. B. 747, 758; 1 Parson's Ship. & Adm., p. 21; *The Julia Blake*, 107 U. S. 418, 427, 428; *Blackenhagen* v. *London Assurance Co.*, 1 Camp. 454. His action was not for or in the interest of the shippers. It was not for the success of the voyage but for the sake of the ship. *Nobel's Explosives Co.* v. *Jenkins, supra*, and *The Styria, supra*, do not apply.

The master had no general discretion to violate the contract for the sake of other goods and passengers. The case is not one in which the doctrines of general average could have application.

It is a necessary inference from *The Julia Blake, supra*, and other recent authorities that the ordinary authority of a master has lessened very much in recent years. The telegraph has enabled the owner to perform much of the master's work in foreign ports. The system of printed bills of lading, and the extensive development of regular lines of steamers, with their accompanying agents and branches abroad, have converted the master into little more than the chief navigator of the ship. The master had no right to disobey the owners' orders. *Codwise* v. *Hacker*, 1 Caines, 526; *Robinson* v. *Hinckley*, 2 Paine, 547, 20 Fed. Cas. 1013; *The Roebuck*, 1 Asp. Mar. Law Cas., N. S. 387.

The telegram received by the master on the night of August 1, 1914, twenty-four hours after the steamer had turned back towards New York, purporting to be signed "Country's Naval Office," could not be used to justify the wrongful deviation made twenty-four hours earlier, even if it had been pleaded or properly proved.

If the abandonment was not due, in a legal sense, to an arrest and restraint of princes, it constituted a wrongful deviation, and all clauses in the bills of lading that may have been designed to bar or limit any of the libelant's claims for damages were thereby nullified.

*Mr. James M. Beck*, with whom *Mr. Carl A. Mead* and *Mr. Edward E. Blodgett* were on the brief, for the National City Bank of New York.

MR. JUSTICE HOLMES delivered the opinion of the court.

This writ was granted to review two decrees that reversed decrees of the District Court dismissing libels against the Steamship Kronprinzessin Cecilie. 238 Fed. Rep. 668. 228 Fed. Rep. 946, 965. The libels alleged breaches of contract by the steamship in turning back from her voyage from New York and failing to transport kegs of gold to their destinations, Plymouth and Cherbourg, on the eve of the outbreak of the present war. The question is whether the turning back was justified by the facts that we shall state.

The Kronprinzessin Cecilie was a German steamship owned by the claimant, a German corporation. On July 27, 1914, she received the gold in New York for the above destinations, giving bills of lading in American form, referring to the Harter Act, and, we assume, governed by our law in respect of the justification set up. Early on July 28 she sailed for Bremerhaven, Germany, via the mentioned ports, having on board 1892 persons, of whom

667 were Germans, passengers and crew; 406, Austrians; 151, Russians; 8, Bulgars; 7, Serbs; 1, Roumanian; 14, English; 7, French; 354, Americans; and two or three from Italy, Belgium, Holland, &c.  She continued on her voyage until about 11.05 P. M., Greenwich time, July 31, when she turned back; being then in 46° 46' N. latitude and 30° 21' W. longitude from Greenwich and distant from Plymouth about 1070 nautical miles.  At that moment the master knew that war had been declared by Austria against Servia, (July 28,) that Germany had declined a proposal by Sir Edward Grey for a conference of Ambassadors in London; that orders had been issued for the German fleet to concentrate in home waters; that British battle squadrons were ready for service; that Germany had sent an ultimatum to Russia, and that business was practically suspended on the London Stock Exchange.  He had proceeded about as far as he could with coal enough to return if that should prove needful, and was of opinion that the proper course was to turn back.  He reached Bar Harbor, Maine, on August 4, avoiding New York on account of supposed danger from British cruisers, and returned the gold to the parties entitled to the same.

On July 31 the German Emperor declared a state of war, and the directors of the company at Bremen, knowing that that had been or forthwith would be declared, sent a wireless message to the master: "War has broken out with England, France and Russia.  Return to New York." Thereupon he turned back.  The probability was that the steamship, if not interfered with or prevented by accident or unfavorable weather, would have reached Plymouth between 11 P. M. August 2, and 1 A. M. August 3, and would have delivered the gold destined for England to be forwarded to London by 6 A. M., August 3.  On August first at 9.40 P. M., before the earliest moment for probably reaching Plymouth, had the voyage kept on, the master received a wireless message from the German Imperial

Marine Office: "Threatening danger of war. Touch at no port [of] England, France, Russia." On the same day Germany declared war on Russia. On August 2, Germany demanded of Belgium passage for German troops, and seized two English vessels with their cargoes. Explanations were offered of the seizures, but the vessels were detained. The German Army entered Luxembourg, and there were skirmishes with French troops. On August 3 Germany was at war with France, and at 11 P. M., on August 4, with England. On August 4 some German vessels were detained by England, and early on the fifth were seized as prize, e. g., *Prinz Adalbert* [1916] P. 81. No general history of the times is necessary. It is enough to add that from the moment Austria declared war on Servia the great danger of a general war was known to all.

With regard to the principles upon which the obligations of the vessel are to be determined it is plain that, although there was a bill of lading in which the only exception to the agreement relied upon as relevant was "arrest and restraint of princes, rulers or people," other exceptions necessarily are to be implied, at least unless the phrase restraint of princes be stretched beyond its literal intent. The seeming absolute confinement to the words of an express contract indicated by the older cases like *Paradine* v. *Jane*, Aleyn, 26, has been mitigated so far as to exclude from the risks of contracts for conduct (other than the transfer of fungibles like money;) some, at least, which, if they had been dealt with, it cannot be believed that the contractee would have demanded or the contractor would have assumed. *Baily* v. *De Crespigny*, L. R. 4 Q. B. 180, 185. Familiar examples are contracts for personal service, excused by death, or contracts depending upon the existence of a particular thing. *Taylor* v. *Caldwell*, 3 Best & Smith, 826, 839. It has been held that a laborer was excused by the prevalence of cholera in the place where he had undertaken to work. *Lakeman* v. *Pollard*, 43 Maine,

463.  The same principles apply to contracts of shipment. If it had been certain that the vessel would have been seized as prize upon reaching England there can be no doubt that it would have been warranted in turning back. See *Mitsui & Co., Limited,* v. *Watts, Watts & Co., Limited,* [1916] 2 K. B. 826, 845. *The Styria,* 186 U. S. 1. The owner of a cargo upon a foreign ship cannot expect the foreign master to run greater risks than he would in respect to goods of his own nation. *The Teutonia,* L. R. 4 P. C. 171. *The San Roman,* L. R. 5 P. C. 301, 307. And when we add to the seizure of the vessel the possible detention of the German and some of the other passengers the proposition is doubly clear. Cases deciding what is and what is not within the risk of an insurance policy throw little light upon the standard of conduct to be applied in a case like this. But we see no ground to doubt that Chief Justice Marshall and Chief Justice Kent would have concurred in the views that we express. *Oliver* v. *Maryland Insurance Co.,* 7 Cranch, 487, 493. *Craig* v. *United Insurance Co.,* 6 Johns. 226, 250, 253. See also *British & Foreign Marine Ins. Co., Limited,* v. *Samuel Sanday & Co.,* [1916] A. C. 650.

What we have said so far we hardly suppose to be denied. But if it be true that the master was not bound to deliver the gold in England at the cost of capture it must follow that he was entitled to take reasonable precautions to avoid that result, and the question narrows itself to whether the joint judgment of the master and the owners in favor of return was wrong. It was the opinion very generally acted upon by German shipowners. The order from the Imperial Marine Office if not a binding command at least shows that if the master had remained upon his course one day longer and had received the message it would have been his duty as a prudent man to turn back. But if he had waited till then there would have been a question whether his coal would hold out. Moreover if

he would have been required to turn back before delivering, it hardly could change his liability that he prophetically and rightly had anticipated the absolute requirement by twenty-four hours. We are wholly unable to accept the argument that although a shipowner may give up his voyage to avoid capture after war is declared he never is at liberty to anticipate war. In this case the anticipation was correct, and the master is not to be put in the wrong by nice calculations that if all went well he might have delivered the gold and escaped capture by the margin of a few hours. In our opinion the event shows that he acted as a prudent man.

We agree with the counsel for the libellants that on July 27 neither party to the contract thought that it would not be performed. It was made in the usual form and, as we gather, charged no unusual or additional sum because of an apprehension of war. It follows, in our opinion, that the document is to be construed in the same way that the same regular printed form would be construed if it had been issued when no apprehensions were felt. It embodied simply an ordinary bailment to a common carrier subject to the implied exceptions which it would be extravagant to say were excluded because they were not written in. Business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs. The case of *The Styria*, 186 U. S. 1, although not strictly in point tends in the direction of the principles that we adopt.

*Decree reversed.*

MR. JUSTICE PITNEY and MR. JUSTICE CLARKE dissent, upon grounds expressed in the opinions delivered by Circuit Judges Dodge and Bingham in the Circuit Court of Appeals—238 Fed. Rep. 668.