**POPE & TALBOT, Inc. v. BLANCHARD LUMBER CO. OF SEATTLE.**

No. 11321.

Circuit Court of Appeals, Ninth Circuit.

Jan. 8, 1947.

HEALY, Circuit Judge, dissenting.

Lillick, Geary, Olson & Charles, Ira S. Lillick, Gilbert C. Wheat and Edward D. Ransom, all of San Francisco, Cal., for appellant.

Farnham P. Griffiths, Charles E. Finney, Martha T. Naylor, McCutchen, Thomas, Matthews, Griffiths & Greene, all of San Francisco, Cal., for appellee.

Before DENMAN, HEALY and ORR, Circuit Judges.

DENMAN, Circuit Judge.

Pope & Talbot, Inc. appeal from a decree in admiralty awarding appellee damages in the amount of freight withheld by appellant upon an agreed sale of appellee's lumber at the port of Los Angeles, California, where appellant's steamer Absaroka, carrying the lumber, took refuge after being torpedoed by a Japanese submarine.

■ Appellant was carrying the lumber on a bill of lading having a freight earned

clause like that in the case of Pope & Talbot, Inc., v. Guernsey-Westbrook Company, 9 Cir., 159 F.2d 139. Appellee contends, as was contended in the Guernsey-Westbrook case, that the clause applies only to the freight which the carrier had declared due on the receipt of the goods. For the reasons stated in the companion case, we hold that the freight to be deemed earned "ship or goods lost or not lost" clause applies to freight other than so declared due.

▮ The remaining question in this admiralty appeal is whether the appellant carrier has lost its right to its earned freight because of its abandonment of the voyage at the port of Los Angeles where the Absaroka sought refuge after her injury. While in the trial de novo of an admiralty appeal we pay due regard to the findings of the trial court, we feel that it erred in its holding that a long extended delay caused by the attack of an enemy vessel in war time cannot warrant the termination of the obligation of the carrier to proceed with the voyage under a bill of lading provision that such a war injured vessel may "store the goods ashore * * * at the port or place where the vessel then is" and that "such disposition of the goods shall constitute a final delivery thereof * * * but the carrier shall retain a lien on the goods for all proper charges" if the "carriage of the cargo is likely to be delayed." [1]

We think the facts show a likelihood of a very long delay beyond anything contemplated by the parties. While not necessary to bring the case within the delay provision, we think the delay amounts to a complete frustration of the vessel's intercoastal voyage from St. Helens, Oregon, to Philadelphia, Pennsylvania.

We further are of the opinion that the effect of the torpedoing of the vessel was such as "may cause" a decision that it was "unsafe or impracticable to proceed from * * * [the] port" of Los Angeles by reason of the presence of a war hazard greater than what was anticipated on December 13, 1941, when the bill of lading was issued, and because of the condition of the cargo after submersion and soaking with fuel oil.

Appellant is a lumber manufacturer engaged in selling its manufactured product and also a steamship owner engaged in the intercoastal transport of lumber for itself and its buyers. Appellee bought from appellant 270,170 feet of green Douglas fir lumber to be transported by appellant under the above bill of lading provisions in the Absaroka from St. Helens to Philadelphia, a voyage customarily of less than two weeks duration.

The Pearl Harbor attack of December 7, 1941, preceded the issuance of the Absaroka bills of lading on December 13. At that time no Japanese submarines had been reported on the Pacific Coast of the United States and it was a matter of speculation whether the Japanese would attempt submarine warfare on a coast some 7,000 miles from its naval bases. On December 20, the vessel's second day from St. Helens, the Absaroka was ordered by radio by Navy officials to come into San Francisco Bay because of a rumor of the presence of a submarine on the coast. This caused delay, the order being countermanded on December 21. The vessel resumed her voy-

---

[1] The pertinent parts of the bill of lading are: "7. * * * If because of conditions, actual or reported, * * * between the port of loading and/or the port of discharge, such as war, hostilities, * * * whether existing or anticipated, which may cause the Master to decide that it is unsafe or impracticable to proceed from or to any port * * * or that the loading or discharging or carriage of the cargo is likely to be delayed, * * * then the vessel may, at its option, * * * store the goods ashore * * * at the port or place where the vessel then is * * * and * * * refuse to commence * * *

loading, transshipment or forwarding operations * * *. Any such disposition of the goods shall constitute a final delivery thereof, terminating all responsibility of the Carrier therefor, but the Carrier shall retain a lien on the goods for all proper charges and expenses including such charges and expenses as are incurred in the retention, storage, forwarding, replacing or other disposition of the goods as aforesaid * * *."

The case was tried here and below on the assumption that this clause was applicable where the decision was finally made by the carrier's manager after consultation with the vessel's master.

age, intending to stop at the port of Los Angeles for fuel.

On December 24, while about five miles from the latter port, the Absaroka was struck by a torpedo between the No. 4 and No. 5 holds, approximately at the level of the 'tween deck. The explosion tore a hole in the shell of the ship approximately 15 feet by 20 feet in size, blew off a small part of the after deckload of lumber and caused the vessel to settle heavily by the stern with an 18° list to starboard. In addition to the injury on the starboard side, the deck frames above and below and the side frames on the port side were heavily bent and distorted. A general alarm was sounded, SOS signals were flashed by radio and the master immediately ordered the crew to abandon ship. Had it not been for the buoyancy of the submerged fir lumber in her holds, the vessel would have sunk. Coast Guard cutters and privately owned tugs went to the assistance of the Absaroka, which commenced to tow the vessel towards Los Angeles Harbor.

The Absaroka was towed by six tugs inside the San Pedro breakwater and was there beached on Cabrillo Beach. Salvage operations were carried out, the lumber cargo not lost was discharged, the discharge being completed on January 7, 1942. Some of the lumber was soaked with fuel oil leaking from punctured double-bottom tanks. After cleaning oil and debris from the No. 5 hold and the machinery space, the Absaroka was placed on dry dock at the plant of the Bethlehem Steel Company on January 19, 1942. Upon completion of survey of the vessel's damages, repair specifications were drawn and a repair contract was negotiated with the Bethlehem Steel Company for an agreed price of $310,000, the tender being dated January 22, 1942. Additional damages were discovered during the performance of repairs and a supplementary specification covering these damages was prepared and submitted to the Bethlehem Steel Company, who submitted a tender in the amount of $14,827 under date of May 7, 1942, to cover this additional work. Repairs were completed and a satisfactory dock trial was run on May 9, 1942.

After deliberating seven weeks until February 5, 1942, that is after five weeks delay beyond the contemplated two weeks voyage to Philadelphia was to have been completed, appellant gave its notice of abandonment. Appellant does not claim that this first five weeks delay is its justification for abandonment under the "likely to be delayed" clause, but that it is justified by the five weeks plus the further "likely" delay which a carrier rationally would anticipate in the then conditions arising from the war with Japan.

It then was obvious to the maritime public and a matter of judicial notice to an admiralty court that the destruction of naval vessels at Pearl Harbor and the enormous injuries to and losses of merchant ships by submarine attack on the Atlantic and Gulf waters would cause all repair facilities of all American shipyards to be crowded beyond their capacity and that priorities would be given by the government to those vessels most needed for a two ocean war. While under ordinary conditions the time for the Absaroka's repairs would take about 45 days, it was a rational anticipation of the appellant's manager that without a special government priority the vessel would be "likely" not to be repaired for months.

The repairs were not completed until May 9, 1942, and then only after the War Shipping Administration on April 4 had given notice that it proposed to take over the vessel. It is likely there would have been many weeks more delay in waiting for the completion of repairs if the ship had not had the priority of a use by the government. As it was the actual delay was 142 days to which should be added 5 days for stowage of her cargo and supplying her if her voyage was to be continued. That is to say, 21 weeks, being 19 weeks delay beyond the normal two weeks voyage.

It is our opinion that no such delay was within even the remote contemplation of the parties as "likely" to occur on December 13 when the bill of lading was issued; and that on February 5, 1942, when the notice of abandonment was given, at least such delay was an imminent likelihood within the meaning of the words "likely to be delayed"

of the abandonment clause of the bill of lading.

■■ In the bill of lading there is another printed clause providing that "Carrier is not and shall not be required to deliver said packages at the port of discharge or port of destination at any particular time, or to meet any particular market, or in time for any particular use." Appellee argues that this provision nullifies the provision for abandonment because of war conditions creating a delay beyond any reasonable anticipation of the parties—here nine and one-half times beyond the normal voyage period of two weeks. We do not agree. The two printed provisions so must be construed that each retains its purpose in the instrument of carriage. The obvious purpose of the last quoted clause has to do with the measurement of damages. It excludes damages specifically arising from a delayed shipment because of a drop in the market value of the lumber or arising from the loss of a particular use to which it was to be put.

■■ With respect to the bill of lading provision warranting abandonment of the voyage because it would be "unsafe or impracticable to proceed," the carrier is faced with a dilemma which it must solve with reference to every shipper of cargo on its vessel, as well as the safety of the vessel herself and the lives of her crew. On the one hand is the bill of lading agreement to carry their goods, "with such reasonable dispatch as the general business of the carrier permits," a part of which business is the care and protection of the crew. On the other hand, if the carrier risks a greater hazard of enemy attack than anticipated by the shippers and their goods thereby are lost, it is liable to the shippers for their value. The Wildwood, 9 Cir., 133 F.2d 765, 769. Also if the lumber has been injured by wetting and is likely further to deteriorate during the period of delay and subsequent carriage or is soaked with fuel oil so that it is "impracticable" to carry it forward, the ship would be liable for the deterioration or for its full value if the fuel oil soaking caused its destruction by fire.

Above all these is the consideration of the hazard to the bodies and lives of the crew, who must rely upon the carrier's superior knowledge of an increased danger above that at the time of sailing.

Obviously it is no solution of the problem that two of the shippers, Blanchard Lumber Company and Guernsey-Westbrook Company, having less than 20 percent of the affreighted cargo, which is likely covered with fire and war risk insurance, notify the carrier that they are willing to take the chance of its loss or deterioration, without regard to the risk to the ship and the remaining cargo or the lives of the sailors.

We think appellant's abandonment of the voyage finds further justification in the increased likelihood of submarine attack beyond that contemplated at the time the bill of lading was executed on December 13, 1941. True, Japanese airplanes six days before had destroyed the fleet at Pearl Harbor, but there was then no certainty that Japanese submarines would operate on the American Pacific Coast, 7,000 miles from their nearest bases. The torpedoing of the Absaroka within five miles of Los Angeles, the first on that coast, was a new factor in the problem of the voyage's accomplishment.

Germany declared war on the United States on December 11, 1941, only two days before the bills of lading were executed. In those two days there was no clear realization of the approaching intensity of the German submarine attacks on American shipping in the Caribbean and Atlantic Coast waters of the Absaroka's voyage to Philadelphia. That increasing menace was brought home to appellant's knowledge before February 5, 1942, by the sinking in the Caribbean of its own steamer the West Ives, with the loss of all her crew, also the first American vessel destroyed in the Caribbean.

The situation for the appellant is like that of The Wildwood, 9 Cir., 133 F.2d 765, a case in this court where, at the time of sailing from New Jersey via the Panama Canal and Honolulu to Vladivostok, Siberia, there was reason for apprehension that the British would exercise a contraband control of vessels going to Russian ports. A British warship had seized off Formosa a vessel bound to that port, a fact known before the Wildwood left Honolulu. After leav-

ing Honolulu the apprehension was heightened by the British seizure in the North Pacific of a vessel bound to Vladivostok and the reported presence of British war vessels there. Though no full contraband control of vessels sailing to Vladivostok in fact was commenced, we held the abandonment of the voyage was justified. We think the abandonment because of the factors of increased hazard to the Absaroko is equally justified.

With regard to the bill of lading provision for abandonment of the voyage if "impracticable to proceed," the testimony is uncontradicted that the cargo of green fir lumber, which was wet with sea water and piled without space between the pieces as required by the port authorities, will deteriorate by warping in form and "burning," i.e., "dry rot," a chemical change in substance. The court's finding that this did not occur has no foundation in the evidence. In addition the lumber, which was oil soaked from the oil of the ship's fuel tanks, constituted a fire menace to itself and the remaining cargo, as well as to the vessel. The port authorities regarded it as a fire hazard and asked that the lumber be removed from the port yards as soon as it could be done.

We think the carrier was justified in believing that it was "impracticable to proceed" with the cargo in such condition.

We have considered the carrier's right to abandon as conferred by the several abandonment provisions of the bill of lading. However, even if the bills of lading had no such provisions, the new hazards after the bills were issued and the voyage commenced constituted a menace so great that it frustrated the voyage enterprise and justified the carrier's abandonment under the principle established in The Kronprinzessin Cecilie, 244 U.S. 12, 24, 37 S.Ct. 490, 61 L.Ed. 960, and stated in The Wildwood, supra.

The decree is reversed.

HEALY, Circuit Judge (dissenting).

I think the judgment should be affirmed.

While the bill of lading gave the carrier broad latitude in respect of the abandonment of the voyage when the carriage of the cargo is likely to be delayed, the clause ought not be construed, as in effect it is here, so as to place the shipper at the mercy of the carrier acting solely in its own interest. Naturally it was to the advantage of the carrier to treat the freight as earned without having transported the cargo. As we said in The Wildwood, 9 Cir., 133 F.2d 765, 767, "Such a clause must be given a reasonable interpretation, and the discretion conferred may not be exercised in an arbitrary or unreasonable manner, nor without substantial grounds, nor will good faith alone suffice."

Much is said in the majority opinion with regard to the likelihood of submarine attack beyond that contemplated; and it would seem that my brothers have thought it necessary to bolster the holding by resort to this and other speculations. However, it is clear, as Judge St. Sure found, that appellant based its decision to abandon the voyage primarily if not entirely on the prospect of delay. The decision was made by Mr. Lunny, appellant's vice-president and director of operations. He testified that it was not known "just how long that vessel would be in repairing, and it was for that reason we abandoned the voyage." Again, at the close of his direct examination he was asked to state the considerations upon which he acted, and replied: "Based on the fact that at the time the known date when the vessel would be ready to complete her voyage was a matter of considerable conjecture, but to our way of thinking it could well be a matter of months and months, and we then abandoned the voyage."

It is my understanding that delay, to work a commercial frustration, must be inordinate or unreasonable. Cf. Admiral Shipping Co., Ltd., v. Weidener, Hopkins & Co. [1916], 1 K.B. 429,436. And the reasonableness of the prospective delay should be determined with reference to the provisions of the contract. The bill of lading did not make time of the essence. On the contrary it provided that "Carrier is not and shall not be required to deliver said packages at the port of discharge or port of destination at any particular time, or to meet any particular market, or in time for any particular use." The carrier in this instance was also the seller. Its reservation of the right

specified seems to me to imply in the purchaser a correlative right to insist upon delivery notwithstanding delay. Here the purchaser, at the time it protested the abandonment of the voyage, expressed a willingness to accept delayed delivery. At the least, under such circumstances, the shipper ought not to be held liable to pay freight where delivery is not made.

I agree with Judge St. Sure's finding that as of February 5, 1942, appellant was not in possession of sufficient facts upon which to base a determination that there would be such unreasonable delay in repairing the vessel as to justify an abandonment. The judge was not able to find, nor am I, any showing that the purpose of the contract would be frustrated by an indefinite delay. At that time the repair contract had already been negotiated and the work of repairing was under way. And as appellant's chief witness, Mr. Lunny, observed: "No one could say what the condition would be at the time the vessel was repaired. She may well have continued her voyage."

Nor did the condition of the lumber justify the abandonment. Paragraph 3 of the bill of lading provided that "full freight and charges shall be payable, and so paid, on all damaged and unsound goods." If the lumber deteriorated the loss would be that of the shipper, not of the carrier. In fact, as the trial court pointed out, some of the lumber stood on the docks for more than five months before being sold, and there is nothing in the record to show that it was thereby injured. My associates speak of the fire hazard to ship and crew because some of the cargo had been oil soaked; but that circumstance did not in any wise influence the decision to terminate the voyage. Mr. Lunny does not so much as mention any hazard of that sort to the ship in his exposition of the reasons for his decision. Had it been a factor of any consequence it is inconceivable that this experienced man would overlook it.

A further word in respect of the submarine menace. The situation in that respect is still too fresh in mind to warrant much elaboration. The trial court found that the danger from submarine attack to a vessel bound on an intercoastal voyage existed at the time the Absaroka sailed, and that appellant was aware of that danger at the time of loading. It further found that the carrier on February 5 expected an indefinite delay, hence it was highly speculative what, if any, menace would exist when the voyage was resumed. These findings are amply supported. Mr. Lunny's testimony indicates that he was fully alive to the submarine campaign in the Atlantic and in the Caribbean against the English and the French prior to our entry into the war. Nor, in view of the surprise attack on Pearl Harbor, was Japanese submarine activity along the coast of such an unforeseeable nature as to warrant the abandonment of a voyage embarked on with the Pearl Harbor attack in mind. Moreover, since appellant knew that the Atlantic waters, through which the vessel must sail, were infested with submarines, it was hardly in a position to abandon the voyage because, as it turned out, a like menace existed in the Pacific.