W. P. LERBLANCE, Jr. and W.
O. Pettit

v.

CONTINENTAL OIL COMPANY,
a corporation.

No. 74–410–C.

United States District Court,
E. D. Oklahoma.

Dec. 30, 1976.

Richard P. Cornish, McAlester, Okl., for plaintiffs.

Clifford K. Cate, Jr., Muskogee, Okl., John Wimbish, Sr., Continental Oil Co., Houston, Tex., for defendant.

## MEMORANDUM OPINION

MORRIS, Chief Judge.

The dispute in this case arises between working interest owners in oil and gas leases concerning the proper construction to be given to an operating agreement. The operating agreement was dated May 30, 1974, and was entered into by and between the plaintiffs, W. O. Pettit and W. P. Lerblance, Jr., and the defendant Continental Oil Company. The case was tried to the court without a jury and based upon the evidence adduced the following findings of fact and conclusions of law are made:

The operating agreement was a contract entered into between the plaintiffs and the defendant, which contemplated the drilling of a well in Section 15, Township 4 North, Range 17 East, Latimer County, Oklahoma. By its terms it designated defendant as operator and the plaintiffs as non-operators. Among its numerous provisions it specified the percentage of costs to be borne by each of the parties with respect to the drilling of the well and also it specified the percentage of production which each of the parties was to receive in the event oil or gas was produced from the land covered by the operating agreement. So far as costs were concerned, defendant was obligated to pay approximately 77.3% of the costs and each of the plaintiffs was obligated to pay approximately 11.3% of the costs.

Paragraph 5 of the operating agreement reads as follows:

Continental Oil Company, a Delaware corporation, shall be the Operator of the Unit Area, and shall conduct and direct and have full control of all operations on the Unit Area as permitted and required by, and within the limits of, this agreement. It shall conduct all such operations in a good and workmanlike manner, but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement.

Paragraph 7 of the Operating Agreement provides as follows:

On or before the 15th day of June, 1974, Operator shall commence the drilling of a well for oil and gas in the following location: at a legal location in the SW/4 Section 15, Township 4 North, Range 17 East, Latimer County, Oklahoma, and shall thereafter continue the drilling of the well with due diligence to a depth sufficient to test the Spiro formation, expected at a depth of approximately 13,000 feet, *unless granite or other practically impenetrable substance is encountered* at a lesser depth or unless all parties agree to complete the well at a lesser depth. (Emphasis added).

Operator shall make reasonable tests of all formations encountered during drilling which give indication of containing oil and gas in quantities sufficient to test, unless the agreement shall be limited in its application to a specific formation or formations, in which event Operator shall be required to test only the formation or formations to which this agreement may apply.

If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon the test as a dry hole, it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible.

Paragraph 11 of the Operating Agreement provides in part as follows:

Without the consent of all parties: (a) No well shall be drilled on the Unit Area *except any well expressly provided for in this agreement* and except any well drilled pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the drilling of a well shall include consent to all necessary expenditures in the drilling, testing, completing, and equipping of the well, including necessary tankage; (b) No well shall be re-worked, plugged back or deepened except a well reworked, plugged back or

deepened pursuant to the provisions of Section 12 of this agreement, it being understood that the consent to the reworking, plugging back or deepening of a well shall include consent to all necessary expenditures in conducting such operations and completing and equipping of said well to produce, including necessary tankage; (c) Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of Ten Thousand and No/100 Dollars ($10,000.00) except in connection with a well the drilling, reworking, deepening, or plugging back of which has been previously authorized by or pursuant to this agreement; provided, however, that in case of explosion, fire, flood, or other sudden emergency, whether of the same or different nature, Operator may take such steps and incur such expenses as in its opinion are required to deal with the emergency and to safeguard life and property, but Operator shall, as promptly as possible, report the emergency to the other parties. Operator shall, upon request, furnish copies of its "Authority for Expenditures" for any single project costing in excess of $5,000.00. (Emphasis added).

Paragraph 12 of the Operating Agreement provides in part:

If all the parties cannot mutually agree upon the drilling of any well on the Unit Area *other than the test well provided for in Section 7,* or upon the reworking, deepening or plugging back of a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities on the Unit Area, any party or parties wishing to drill, rework, deepen or plug back such a well may give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. (Emphasis added.)

The dispute between the parties in this case arose because defendant, prior to reaching the projected depth of 13,000 feet and without testing the Spiro formation, plugged and abandoned the well, and did so without the consent of the plaintiffs. The reason the well was plugged and abandoned at an approximate depth of 7,600 feet was because, during drilling operations, the hole fell in and the drill pipe became stuck in the hole. Diligent and continued efforts to remove the drill pipe from the hole were futile and as a result approximately 1200 feet of drill pipe and drill collars, referred to as the "fish," were left in the hole. Instead of attempting further remedial operations or further attempted drilling, Continental plugged and abandoned the well.

The plaintiffs brought suit against defendant in state court seeking a declaratory judgment that they be relieved from paying their respective shares of approximately 11% of the costs of drilling the well. The case was removed to this court. This court has jurisdiction based upon diversity and amount in controversy. Defendant answered and counterclaimed asserting its entitlement as against each of the plaintiffs for his respective share of the costs of drilling the well. It was stipulated and agreed that the plaintiff W. P. Lerblance, Jr. paid to the defendant his full proportionate part of the well costs in the amount of $63,203.13. It is also stipulated and agreed that the well costs assessable against the plaintiff W. O. Pettit, should it be determined that he is liable for those costs, is $65,189.99, including interest to May 1, 1975. No part of this sum was paid by plaintiff Pettit to defendant. Although neither plaintiff had ever acted as an operator under an operating agreement, each was an experienced oil man, having participated in numerous oil and gas drilling ventures. W. O. Pettit had participated in roughly 30 wells and W. P. Lerblance, Jr. had participated in 50 or 60 wells.

The well was spudded in on or about June 5, 1974. It was known as the Wallace 15. The formations being penetrated were shaley. According to plaintiff Pettit, "[t]his country is real shaley and it is porous and it will cave in on you in a minutes notice. You just don't really have any warning a lot of times." The formations encountered

were not on a horizontal plane but instead dipped at a substantial angle. The bore hole deviated from the vertical and had an abrupt dogleg angle. On July 3, while drilling at 4960' the "hole fell in." The drill string was pulled out of the hole, the "fill" was cleaned out of the hole and drilling resumed. Again on August 22 "the hole fell in while drilling at 7647'." This time the drill pipe became stuck and various attempts were made to get the drill pipe out of the hole, to no avail. These attempts continued on August 26, 27, 28, 29, and 30. On September 3, while attempting to get the fish out of the hole, the pipe partially collapsed. Finding that the fish could not be fished out of the hole, defendant removed the fishing tools from the hole, laid them down, cut the casing at a depth of 4,512 feet and prepared to abandon the hole. The fish remaining in the hole was 1200 feet of drill pipe, collars and bit. On September 4 that portion of the drill pipe which could be removed was removed and further drilling attempts came to a halt. The well was junked and abandoned.

Consent of plaintiffs to plug and abandon the well was not obtained and plaintiffs were not notified in advance of defendant's intention to plug and abandon.

Plaintiffs at one time claimed defendant was negligent in its drilling operations but later abandoned that claim.

In this immediate geographic area defendant owned oil and gas leases on approximately seven or eight thousand acres. Prior to drilling the Wallace 15, other wells had been drilled by defendant. The first was the Wallace 17. It was two miles west of the Wallace 15. The Wallace 17 had tested the Spiro formation, which was the deepest prospective formation in the area; it was found to be productive of gas. However, the well was not completed in that formation inasmuch as the quantities of gas were not substantial and the well was completed as a producer in the shallower formation known as the Fanshawe. The next well drilled was the Wallace 16, which was an offset to the Wallace 17, and was one mile west of the Wallace 15. The Wallace 16 was not drilled to the Spiro formation and was also completed in the Fanshawe. Drilling difficulties were also encountered in drilling this well. The well in question, that is to say the Wallace 15, was drilled as an offset to the east, one mile east of the Wallace 16.

The geology in this area is complicated. There are numerous faults. The rock formations are not horizontal but instead have substantial dip. The Wallace 17 was one of the first wells drilled south of the Choctaw fault which penetrated the Spiro formation. When defendant made the decision to plug and abandon the Wallace 15 it had drilled through two shallower formations, the Atoka and the Fanshawe, neither of which were productive of oil or gas. The most prospective formation above the Spiro was the Fanshawe, which the Wallace 16 was producing from, but in the Wallace 15 that formation was found to be hard and tight and unproductive.

Another severe problem encountered by defendant in drilling the Wallace 15 was deviation from the vertical in the drilling well. At 6332 feet the deviation was 8½ degrees. Just below 7,000 feet it exceeded 10 degrees. With deviation of those amounts at those depths it was expected that greater problems of deviation from the vertical would be encountered at greater depths. The total cost expended on the Wallace 15, including the costs of the several days of fishing in an attempt to get the fish out of the hole before the well was plugged and abandoned, exceeded $600,000. Prior to commencement of drilling it was estimated that the total cost of drilling a well to the Spiro formation would be $477,-300 if it were a producing well.

With a 1200 foot fish in the hole, defendant's alternatives were:

(a) drill through the 1200 feet of iron by simply milling it up. The rate of progress would have been 3 or 4 feet a day; it would have taken 300 days.

(b) cut a window in the 9⅝" casing above the fish and drill, if possible, a new hole to total depth and test the Spiro. The estimated cost of such procedure was $656,800.

(c) sidetrack at a depth of 4400 feet and drill, if possible, a new hole to total depth and test the Spiro. The estimated cost of such a procedure was $637,400.

(d) pull the pipe and pull the casing and plug and abandon the well.

All of these alternatives were considered. Drilling deeper by whipstocking around the fish after cutting a window in the 9⅝″ casing or after sidetracking was not a practical alternative, Continental had whipstocked around a "fish" in the Wallace 16 when the tools were stuck in the hole but that well was completed in the Fanshawe at a depth of approximately 8000 feet. The uncontroverted evidence here is that in view of the severe dogleg deviation in the Wallace 15 and in view of the amount of weight or pressure that would have to be expended on the drill pipe to drill to 13,000 feet, collapse or failure of the drill pipe would probably occur. The cost would exceed 600,000 additional dollars even if it could be achieved mechanically, which was doubtful. After considering all factors defendant plugged and abandoned the well.

Plaintiffs contend that defendant breached the operating agreement because it failed to comply with the provisions of paragraph 7. In particular plaintiffs argue that Continental failed to "continue the drilling of the well with due diligence to a depth sufficient to test the Spiro formation expected at a depth of approximately 13,000 feet, unless granite or other practically impenetrable substance is encountered at a lesser depth. . . ." That, say plaintiffs, was Continental's clear obligation under the contract. In particular the plaintiffs urge upon the court the holding of the Oklahoma Supreme Court in *Cosden Oil & Gas Co. v. Moss,* 131 Okl. 49, 267 P. 855 (1928). In that case the parties had entered into an agreement, the exact nature of which was in dispute, but which it was contended obligated the defendant to drill to a depth of 2000 feet unless oil or gas be found in paying quantity at a lesser depth or unless a granite mass formation be encountered at a lesser depth. The defendant abandoned drilling at a depth of 1410′

claiming it encountered a granite mass formation. The plaintiffs sued to recover damages in the amount of $35,000. The case was tried to a jury and judgment in favor of the plaintiffs was rendered in the amount of $10,000.00. The Supreme Court of Oklahoma reversed because of the failure of the trial court to instruct on the defendants' theory of the case. The case does not deal with the question of what constitutes a "practically impenetrable substance," which is the issue in this case. It is, however, instructive to note that the Supreme Court, in reaching its conclusion, does make the following observations:

> Where it is apparent that a contract was entered into on the basis of the existence of something essential to its execution, there is the implied condition of the contract that, if literal performance becomes *impracticable* or impossible by reason of the nonexistence of the essential thing, to the extent of nonexistence performance will be excused, and in such circumstances the terms "impractical" and "impossible" are of equal legal effect. 131 Okl. at 53, 267 P. at 859. (Emphasis added.)

And in referring to and quoting the Supreme Court of the United States in *North German Lloyd Co. v. Guaranty Trust Co.,* 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960, the court said:

> It was there said that "business contracts must be construed with business sense as they would be understood by intelligent men of affairs." 131 Okl. at 54, 267 P. at 859.

The contract provides that defendant will test the Spiro formation "unless granite or other practically impenetrable substance is encountered at a lesser depth." Plaintiff argues that this clearly means granite or some other geologic formation which is impenetrable. Defendant contends that "practically impenetrable substance" embraces that combination of drilling conditions which practically preclude further drilling. These conditions include shaley formations, cave-ins, abrupt dogleg angle in the well, a 1200 foot fish in the hole at 7600 feet, the mechanical non-feasibility in whip-

stocking around the fish in attempting to drill to 13,000 feet and the substantial cost of drilling to that depth.

The defendant argues that *Arkla Exploration Co. v. Boren,* 411 F.2d 879 (8th Cir. 1969), is on "all fours" with the case at bar. In that case the parties made and entered into an operating agreement which obligated the operator, as in the case at bar, to drill a well to a depth of "12,000 feet or to the top of the Mississippian formation whichever occurred first, *unless granite or other practically impenetrable substance is encountered at a lesser depth. . . .*" (Emphasis added). The operator abandoned the well at a depth of approximately 8600 feet. The reason that the well was abandoned was because the operator encountered "unanticipated difficulties . . . in drilling the well which greatly increased the costs of drilling." That case was tried to a jury in which the operator sued the nonoperator to recover his proportionate share of the drilling costs. In that case the court instructed the jury as follows:

> You are instructed that the contract uses the terms "practically impenetrable substance."

> You are instructed that practically impenetrable substance in this lawsuit is any substance that is encountered which is not penetrable with reasonable cost and facilities as long as the driller has performed the drilling with due diligence and without negligence. In other words, a practically impenetrable substance is one in which with available equipment and at a reasonable cost the substance cannot be penetrated. 411 F.2d at 881.

The defendants objected to the instruction and in discussing the meaning of the phrase "practically impenetrable substance" the court stated:

> Moreover, we believe the use of the word "practically" preceding the words "impenetrable substance" has considerable significance. "Practically" is defined in Webster's Unabridged Dictionary as follows: "in a practical way; as * * * virtually, to all practical purposes (although not entirely or absolutely)." In

the somewhat analogous field of impossibility, § 454, Restatement Contracts, provides:

> "In the Restatement of this Subject impossibility means not only strict impossibility but impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved."

See Corbin on Contracts, § 1325.

The facts do not reveal in *Arkla* what the nature of the practically impenetrable substance was. The case simply states that "unanticipated difficulties were encountered in drilling the well which greatly increased the cost of drilling." It may or may not have been associated with the type or kind of difficulties which were encountered in this case. In any event, the court concluded in that case that the instructions given to the jury were proper, that the operator had not gone beyond the bounds permitted by the operating agreement in deciding on his own to plug and abandon the well at a shallower depth.

In the case at bar it is clear that inordinate difficulties were encountered by the defendant in drilling the well. The formations in question had a tendency to cave in. The beds which were being penetrated had relatively steep dip causing difficulty in maintaining vertical penetration by the drill bit. Deviation was abrupt and severe. 1200 feet of iron was in the hole. More than $600,000 had been expended to achieve a depth of approximately 7600 feet. The cost of sidetracking or drilling a window in the casing and drilling the well to the projected depth, even if mechanically possible, would have made the total cost of the well in excess of 1.2 million dollars. Under these circumstances defendant encountered a "practically impenetrable substance" within the meaning of the operating agreement.

Plaintiffs also argue that it was incumbent upon defendant to get the consent of plaintiffs before plugging and abandoning the well. They make this argument based in part upon the last sentence in paragraph 7 of the operating agreement and also based upon the language contained

in paragraphs 11 and 12. They argue that if the defendant had given them notice they would have had an opportunity to take over the well and to complete it in such fashion as they might see fit. The last sentence in paragraph 7 of the operating agreement provides:

> If in Operator's judgment the well will not produce oil or gas in paying quantities, and it wishes to plug and abandon *the test as a dry hole,* it shall first secure the consent of all parties to the plugging, and the well shall then be plugged and abandoned as promptly as possible. (Emphasis added).

"Dry hole" has been defined as follows:

> A *completed well* which is not productive of oil and/or gas (or which is not productive of oil and/or gas in paying quantities). To qualify as a dry hole, a well must have been *completed.* . . . Williams and Meyers, Manual of Oil & Gas Terms (1971) (Emphasis added).

"Completed well" has been defined as follows:

> A dry hole; or a well capable of producing oil or gas; *or a well drilled to such depth that oil or gas is not likely to be encountered at greater depths*; or a well drilled to that reasonable depth at which the existence of oil or gas is usually proved or disproved in the locality. Williams and Meyers, Manual of Oil & Gas Terms (1971).

The last sentence of paragraph 7 of the operating agreement has no application in this case. The Wallace 15 was never completed. The Spiro formation was not tested, although it had been found to be productive in the Wallace 17. The well was clearly not a dry hole as that term is above defined, as it is normally used in the industry, or as it is used in the operating agreement inasmuch as the Spiro formation was never reached, was never tested, and hence no determination was made whether in the Wallace 15 such formation was dry or would produce oil or gas.

The language in paragraph 11 is not applicable in this case, either. Examination of that language reveals that under subparagraph (a) it applies only to a well *other than the test well.* The test well is expressly provided for in this agreement and the language under paragraph (a) has no application to it. Hence it was unnecessary to secure the consent of all parties concerning the drilling of the Wallace 15. Further, the language of subparagraph (b) does not apply because it applies only to those wells which shall be "reworked, plugged back or deepened" pursuant to the provisions of section 12. Section 12 in speaking of reworking, deepening or plugging back of wells is limited to the reworking, deepening or plugging back of a *"dry hole"* and the well in this case was not a dry hole. It accordingly was not necessary for defendant to give notice to or get the consent of the plaintiffs to plug and abandon the test well drilled pursuant to the provisions of the operating agreement.

The plaintiffs do not contend in this case that the operator did not drill the well with diligence or did not drill it in a workmanlike manner or that the operator was grossly negligent. As noted earlier plaintiffs abandoned any claim of negligence. It should be noted in this regard that paragraph 5 of the operating agreement provides that the operator "shall conduct all such operations in a good and workmanlike manner but it shall have no liability as Operator to the other parties for losses sustained, or liabilities incurred, except such as may result from gross negligence or from breach of the provisions of this agreement." Continental did not breach the provisions of paragraph 7 of the operating agreement when it plugged and abandoned the Wallace 15 after it encountered a "practically impenetrable substance."

For these reasons, the action of the plaintiffs must be dismissed and the defendant will recover on its counterclaim against each of the plaintiffs for his proportionate part of the drilling expenses on the Wallace 15 well. Defendant will submit a proposed judgment within 10 days. Plaintiffs will have 5 days thereafter to object to the form of the proposed judgment.

Defendant has also prayed for the recovery of attorneys fees. The defendant is directed to submit an appropriate affidavit concerning the attorneys fees which it claims should be awarded in this case at the time it submits its proposed judgment. Plaintiffs will have 5 days thereafter within which to respond. At the request of either side the court will set a hearing with respect to the propriety or the amount of attorneys fees, if it is the desire of either side to have a hearing.

ORDERED this 30th day of December, 1976.