909 P.2d 408

**7200 SCOTTSDALE ROAD GENERAL PARTNERS dba Scottsdale Plaza Resort, Plaintiff–Appellant,**

**v.**

**KUHN FARM MACHINERY, INC., a Foreign Corporation, Defendant–Appellee.**

**No. 1 CA–CV 93–0052.**

Court of Appeals of Arizona, Division 1, Department D.

May 2, 1995.

Reconsideration Denied June 23, 1995.

Review Denied Jan. 17, 1996.*

---

* Corcoran, J., of the Supreme Court, did not participate in the determination of this matter.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth and Beshears, P.A. by Steven M. Rudner, Frank W. Moskowitz, Christopher Robbins, Phoenix, for plaintiff-appellant.

Fennemore Craig by Roger T. Hargrove, Ann–Martha Andrews, Phoenix, for defendant-appellee.

## OPINION

TOCI, Judge.

Kuhn Farm Machinery, Inc. ("Kuhn") contracted with 7200 Scottsdale Road General Partners dba Scottsdale Plaza Resort (the "resort"), to use the resort's facilities for a convention at which Kuhn's European personnel were to present new products to Kuhn's dealers and employees. In this appeal from the granting of a summary judgment for Kuhn, we consider the following issue: did the risk to air travel to Scottsdale, Arizona, posed by the Gulf War and Saddam Hussein's threats of worldwide terrorism, substantially frustrate the purpose of the contract?

Reversing the trial court's grant of summary judgment for Kuhn, we hold as follows. First, the resort did not contract with the understanding that Kuhn's European personnel were crucial to the success of Kuhn's convention. Thus, even if the attendance of the Europeans at the Scottsdale convention was thwarted by the threat to international air travel, their nonattendance did not excuse Kuhn's performance under the contract. Neither did the risk to domestic air travel posed by the Gulf War entitle Kuhn to relief. Although that risk may have rendered the convention uneconomical for Kuhn, the threat to domestic air travel did not rise to the level of "substantial frustration." Finally, Kuhn's cancellation based on the perceived risk of terrorism was not an objectively reasonable response to an extraordinary and specific threat. Consequently, Kuhn is not entitled to relief on the theory of "apprehension of impossibility."

## I. FACTS AND PROCEDURAL HISTORY

### A. Background

On February 9, 1990, the resort and Kuhn signed a letter agreement providing that Kuhn would hold its North American dealers' convention at the resort. The agreement required the resort to reserve, at group rates, a block of 190 guest rooms and banquet and meeting rooms for the period from March 26, 1991, to March 30, 1991. Kuhn, in turn, guaranteed rental of a minimum number of guest rooms and food and beverage revenue of at least $8,000 from the use of the meeting and banquet rooms.

The agreement contained remedies protecting the resort if Kuhn canceled the meeting. Kuhn was required to pay liquidated damages for any decrease after January 25, 1991, of ten percent or more in the reserved room block. Additionally, the resort agreed to accept individual room cancellations up to seventy-two hours prior to arrival without penalty so long as total attrition did not exceed five percent. The agreement also provided that, because the loss of food and beverage revenues and of room rentals resulting from cancellation were incapable of estimation, cancellation would result in assessment of liquidated damages.[1]

Because Kuhn refused to hold its dealers' meeting at the resort at the time specified in the agreement, the resort sued for breach of contract, seeking the liquidated damages provided for in the agreement. The resort then moved for partial summary judgment to obtain a ruling in its favor on the issue of liability. Kuhn filed a cross motion for summary judgment, alleging that its performance was discharged or suspended pursuant to the doctrines of impracticability of performance and frustration of purpose.

### B. Additional Facts Established by Kuhn's Motion

In support of its motion for summary judgment, Kuhn offered the following facts. Kuhn S.A., the parent of Kuhn, is headquartered in France, where it manufactures farm machinery. Both companies engage in inter-

---

1. If cancellation occurred between March 26, 1990 and to August 26, 1990, the damages would be $75,000, equivalent to 50 percent of anticipated group room, food, and beverage revenue.

   If cancellation occurred between August 26, 1990 and December 26, 1990, the damages would be $112,000, equivalent to 75 percent of anticipated group room, food, and beverage revenue.

   If cancellation occurred between December 26, 1990 and March 26, 1991, the damages would be $150,000, equivalent to 100 percent of anticipated group room, food, and beverage revenue.

national sales of farm machinery manufactured by Kuhn S.A. They sell their products through direct sales by their employees and through independent dealerships.

Kuhn and Kuhn S.A. planned to use the North American dealers' convention to introduce new products to Kuhn's sales people and dealers, stimulate enthusiasm for the new products, and provide its sales people and dealers with information to effectively market and sell the products. To accomplish these goals, Kuhn invited its top 200 independent dealers from the United States and Canada ("North Americans"), as well as some of its overseas suppliers, to attend the meeting. Approximately twenty-five Kuhn and Kuhn S.A. employees and suppliers from the United States, Europe, and Australia were to host the convention and present the new products.

Kuhn considered the overseas personnel ("Europeans") crucial to the presentation and success of the dealers' meeting. Of all of Kuhn's personnel, they were the most familiar with the design, manufacture, and production of the new products. Kuhn intended the Europeans to play the primary role in presenting the products and leading the discussions at the convention.

On August 2, 1990, Iraq invaded Kuwait. A few days later, the United States began sending troops to the Middle East. On January 16, 1991, the United States and allied forces, in Operation Desert Storm, engaged in war with Iraq. As a result, Saddam Hussein and other high-ranking Iraqi officials threatened terrorist acts against the countries that sought to prevent Iraq's takeover of Kuwait. Hussein stated, "hundreds of thousands of volunteers . . . [would become] missile[s] to be thrown against the enemy . . ." and "the theater of operations would [include] every freedom fighter who can reach out to harm the aggressors in the whole world. . . ."

Because many newspapers reported a likelihood of terrorism, Kuhn became concerned about the safety of those planning to attend the convention. Kuhn was particularly concerned about international travel, but Kuhn also perceived a risk of terrorism within the United States.

Kuhn discovered that, apparently because of the war, convention attendance would not meet expectations. Many of Kuhn's employees who were to attend the meeting were concerned about the safety of air travel. Timothy Harman, general sales manager of Kuhn, personally spoke with several dealers who voiced their apprehension about traveling during the war. Because tentative registration was lower than Kuhn had anticipated when it signed the agreement, in late January—two months prior to the date of the planned convention—Kuhn reduced the reserved room block by more than twenty-five percent.

Interest in the proposed convention continued to wane. From February 4 to February 14, 1991, several of Kuhn's top dealerships who had won all-expense-paid trips to the convention canceled their plans to attend. By mid-February, eleven of the top fifty dealerships with expense-paid trips had either canceled their plans to send people to the convention or failed to sign up.

Kuhn S.A. wrote to the resort on February 14, 1991, requesting cooperation in rescheduling the meeting for a later date. Among other things, the letter stated that Kuhn was concerned with the safety of its people, that the dealers were reluctant to travel, and that attendance had decreased to a level making it uneconomical to hold the convention.

Without waiting for the resort's response, Kuhn decided to postpone the scheduled meeting. On February 18, 1991, Kuhn notified all potential convention participants that the dealers' meeting had been postponed. Although Kuhn and the resort did attempt to reschedule the meeting for the following year, the rescheduling negotiations broke down. The convention was never held at the resort.

## C. The Resort's Response To Kuhn's Motion

The resort did not dispute Kuhn's description of the planned convention; rather, the resort contested the extent of the threat to air travel. Specifically, the resort noted that the articles cited by Kuhn indicated either

that there was little risk or that the risk was primarily to overseas locations.

The resort also contested the inferences to be drawn from the facts presented by each party. The resort asserted that the facts did not establish that the threat of terrorism frustrated the ability of Kuhn associates to fly to Scottsdale. Although conceding that several dealers canceled because of fear of terrorism, the resort emphasized that nearly all of the approximately 150 dealers registered for the meeting signed up after the Operation Desert Storm attack on Iraq. In the resort's view, Kuhn's January 29, 1991, request for a reduction in the room block to 140 rooms impliedly reconfirmed the convention after the commencement of the war. The resort argued that these facts, taken with all others that had been presented, demonstrated as a matter of law that the defenses of impracticability of performance and frustration of purpose were inapplicable.

The trial court granted summary judgment to Kuhn, ruling that Kuhn proved both of its defenses. Before formal judgment was entered, the resort filed a motion for reconsideration, asking the trial court to consider certain new evidence it had obtained through discovery. The trial court denied the motion. The resort appeals from the summary judgment ruling, from the denial of its motion for reconsideration, and from the denial of a request it made to strike certain evidence that Kuhn had presented.

## II. IMPRACTICABILITY DISTINGUISHED FROM FRUSTRATION OF PURPOSE

The trial court held that the contract was discharged under the doctrines of impracticability of performance and frustration of purpose. These are similar but distinct doctrines. *See* Restatement (Second) of Contracts ("Restatement") § 265 cmt. a (1981) (discussing the differences between impracticability of performance and frustration of purpose). Impracticability of performance is, according to the Restatement, utilized when certain events occurring after a contract is made constitute an impediment to

performance by either party. *See* Restatement § 261. Traditionally, the doctrine has been applied to three categories of supervening events: death or incapacity of a person necessary for performance, destruction of a specific thing necessary for performance, and prohibition or prevention by law. *Id.* cmt. a.

On the other hand, frustration of purpose deals with "the problem that arises when a change in circumstances makes one party's performance virtually worthless to the other . . . ." Restatement § 265 cmt. a. "Performance remains possible but the expected value of performance to the party seeking to be excused has been destroyed by a fortuitous event, which supervenes to cause an actual but not literal failure of consideration." *Lloyd v. Murphy*, 25 Cal.2d 48, 153 P.2d 47, 50 (1944). While the impact on the party adversely affected is the same regardless of which doctrine is applied, frustration of purpose, unlike the doctrine of impracticability, involves no true failure of performance by either party.

Notwithstanding, some cases speak of a contract as "frustrated" when performance has become impossible or impracticable.[2] *See, e.g., Matheny v. Gila County*, 147 Ariz. 359, 360, 710 P.2d 469, 470 (App.1985) (doctrine of commercial frustration is not necessarily limited to strict impossibility). This usage is inaccurate. "[F]rustration is not a form of impossibility even under the modern definition of that term, which includes not only cases of physical impossibility but also cases of extreme impracticability of performance." *Lloyd*, 153 P.2d at 50; *see also* Arthur Anderson, *Frustration of Contract—A Rejected Doctrine*, 3 DePaul L.Rev. 1, 3–4 (1953) ("[T]he concepts of frustration of purpose and impossibility or impracticability of performance are mutually in opposition.").

Turning to the contract between Kuhn and the resort, Kuhn clearly has no claim for impossibility or impracticability. The contract required the resort to reserve and provide guest rooms, meeting rooms, and food and services. In return, Kuhn was required to pay the monies specified in the

---

**2.** The Restatement no longer uses the term "impossibility." Instead it substitutes the term "im-

practicability" for impossibility. *See* Restatement ch. 11 reporter's note, at 312.

contract. Kuhn does not allege that it was impossible or impracticable to perform its contractual duty to make payment for the reserved facilities. Rather, it contends that the value of the resort's counter-performance—the furnishing of convention facilities—was rendered worthless because of the Gulf War's effect on convention attendance. This is a claim of frustration of purpose.

## III. FRUSTRATION OF PURPOSE

### A. *Krell v. Henry*

The doctrine of frustration of purpose traces its roots to *Krell v. Henry,* [1903] 2 K.B. 740. There, the owner of a London apartment advertised it for rent to observe the King's coronation parade. Responding to the advertisement, the renter paid a deposit and agreed to rent the apartment for two days. When the coronation parade was postponed, the renter refused to pay the balance of the rent. The court held that the contract to rent the apartment was premised on an implied condition—the occurrence of the King's coronation parade. *Id.* at 754. Accordingly, when the parade was canceled, the renter's duty to perform was discharged by the frustration of his purpose in entering the contract. *Id.*

Several aspects of *Krell* are worth noting. First, the owner of the apartment was prepared to render the entire performance promised by him; the postponement of the coronation procession did not diminish the value of the contract to the owner. Second, the renter could have performed by simply paying the rental fee for the apartment. In other words, there was no impediment to the renter's performance of the contract. The renter's sole grievance was that his intended benefit from the contract had not been realized. *See* Anderson, *supra,* at 2.

The complaint that a contracting party did not realize the benefit he intended to realize from the contract has been described as "frustration-in-fact." *Id.* Frustration-in-fact results when, because of events subsequent to formation of a contract, the desirability of

the performance for which a party contracted diminishes. *Id.* at 3. The issue then becomes: should legal consequences flow from a contracting party's failure to realize the expected benefit from a contract?

### B. Frustration of Purpose and The Equitable Doctrine of *Lloyd*

Significantly, the very courts that created the doctrine of frustration of purpose have questioned its soundness. *Lloyd,* 153 P.2d at 49. In this country, some commentators have asserted that the doctrine rests on a tenuous rationale for shifting the burdens of unexpected events from the promisor to the promisee. *See* Edwin W. Patterson, *Constructive Conditions in Contracts,* 42 Colum.L.Rev. 903, 950–954 (1942); T. Ward Chapman, Comment, *Contracts–Frustration of Purpose,* 59 Mich.L.Rev. 98, 110–117 (1960).

Despite this criticism, many authorities, including the courts of Arizona, extend limited relief for frustration-in-fact through an extraordinary legal remedy closely resembling relief in equity.[3] *See* 18 Samuel Williston, A Treatise on the Law of Contracts § 1954, at 129 (Walter H.E. Jaeger ed., 3d ed. 1978) (frustration doctrine may be viewed as equitable defense asserted in an action at law); *Cf. Opera Co. of Boston v. Wolf Trap Found. for the Performing Arts,* 817 F.2d 1094, 1099 (4th Cir.1987) (same assertion regarding impossibility doctrine). As Justice Traynor pointed out in his frequently cited opinion in *Lloyd:*

> The question in cases involving frustration is whether the equities of the case, considered in the light of sound public policy, require placing the risk of a disruption or complete destruction of the contract equilibrium on defendant or plaintiff under the circumstances of a given case, and the answer depends on whether an unanticipated circumstance, the risk of which should not be fairly thrown on the promisor, has made performance vitally different from what was reasonably to be expected.

---

**3.** The doctrine is well established in American law. *See* Patterson, *supra,* at 951. *But see generally* Anderson, *supra.* The doctrine also is established in Arizona. *See Matheny,* 147 Ariz. at 360, 710 P.2d at 470; *Garner v. Ellingson,* 18 Ariz. App. 181, 184, 501 P.2d 22, 25 (1972).

153 P.2d at 50 (citations omitted). Virtually all Arizona cases applying the doctrine have approved of this approach. *See Mohave County v. Mohave–Kingman Estates, Inc.,* 120 Ariz. 417, 422–23, 586 P.2d 978, 983–84 (1978); *Mobile Home Estates, Inc. v. Levitt Mobile Home Sys., Inc.,* 118 Ariz. 219, 222, 575 P.2d 1245, 1248 (1978); *Matheny,* 147 Ariz. at 360, 710 P.2d at 470; *Garner,* 18 Ariz.App. at 182–83, 501 P.2d at 23–24.

## C. The Restatement Approach to Frustration of Purpose

Although the modern doctrine of frustration of purpose appears in Restatement § 265 and the comments, *see Washington State Hop Producers, Inc. v. Goschie Farms,* 112 Wash.2d 694, 773 P.2d 70, 73 (1989) (quoting Restatement § 265 cmt. a as the appropriate test), past Arizona cases applying the doctrine of frustration of purpose have relied on *Lloyd* rather than on the Restatement. *See Mohave County,* 120 Ariz. at 422–23, 586 P.2d at 983–84; *Mobile Home Estates,* 118 Ariz. at 222, 575 P.2d at 1248; *Matheny,* 147 Ariz. at 360, 710 P.2d at 470; *Garner,* 18 Ariz.App. at 182–83, 501 P.2d at 23–24. Applying *Lloyd*'s rationale that the "purpose of a contract is to place the risks of performance upon the promisor," 153 P.2d at 50, Arizona courts have stated that " '[t]he doctrine of frustration has been severely limited to cases of extreme hardship so as not to diminish the power of parties to contract.... ' " *Matheny,* 147 Ariz. at 360, 710 P.2d at 470 (quoting *Garner,* 18 Ariz.App. at 183, 501 P.2d at 24).

Nevertheless, neither *Lloyd* nor the Arizona cases that have relied upon it are inconsistent with Restatement section 265. The reporter's note to Restatement section 265 cites *Lloyd* as authority for illustration 6 of that section. Furthermore, in line with the Arizona cases of *Matheny* and *Garner,* the requirements for the doctrine of frustration of purpose stated in comment a provide adequate protection for the power to contract. Consequently, we follow Restatement section 265, particularly comment a, in this case. *See City of Phoenix v. Bellamy,* 153 Ariz. 363, 366, 736 P.2d 1175, 1178 (App.1987) (in the absence of law to the contrary, Arizona generally follows the Restatement).

## D. Standard of Review

The trial court granted Kuhn's cross-motion for summary judgment on the theory that the purpose of Kuhn's contract with the resort was frustrated. In reviewing an order granting summary judgment, we must determine whether there is a genuine issue of disputed material fact. *In re Estate of Johnson,* 168 Ariz. 108, 109, 811 P.2d 360, 361 (App.1991). Where the facts are not in dispute, we analyze the record to determine if the trial court correctly applied the law to the undisputed facts. *Heartfield v. Transit Management of Tucson, Inc.,* 171 Ariz. 181, 182, 829 P.2d 1227, 1228 (App.1991). We are not bound by the trial court's conclusions of law. *Gary Outdoor Advertising Co. v. Sun Lodge, Inc.,* 133 Ariz. 240, 242, 650 P.2d 1222, 1224 (1982).

Here, the underlying facts are undisputed. Both sides conceded below that there were no additional factual matters to be developed beyond those presented in the motions for summary judgement; each party asserted that the court should rule on the questions of frustration of purpose as a matter of law. We, too, "fail to find any disputed *factual* inferences which arise from the undisputed facts in this case. Rather, it is the legal conclusions to be drawn from these facts that are in actual dispute." *Scottsdale Jaycees v. Superior Court,* 17 Ariz.App. 571, 574, 499 P.2d 185, 188 (1972).

Whether a party to a contract is entitled to relief under the doctrine of frustration of purpose is generally treated as a question of law. Restatement ch. 11 introductory note, at 310. As noted above, frustration of purpose is essentially an equitable doctrine, and the power to grant relief under that doctrine is reserved to the court. Arizona courts have frequently followed this general rule. *See Mohave County,* 120 Ariz. at 422–23, 586 P.2d at 983–84; *Matheny,* 147 Ariz. at 360, 710 P.2d at 470; *Korman v. Kieckhefer,* 114 Ariz. 127, 129–30, 559 P.2d 683, 685–86 (App. 1976); *Garner,* 18 Ariz.App. at 183, 501 P.2d at 24. Thus, the issues to be considered here—principal purpose and substantial frustration—are questions of law for the court.

## IV. RESOLUTION OF THIS CASE

### A. Requirements for Relief

Restatement section 265 comment a lists four requirements that must exist before relief may be granted for frustration of purpose. First, "the purpose that is frustrated must have been a principal purpose of that party" and must have been so to the understanding of both parties. Restatement § 265 cmt. a. Second, "the frustration must be substantial ...; [it] must be so severe that it is not to be regarded as within the risks assumed ... under the contract." *Id.* Third, "the non-occurrence of the frustrating event must have been a basic assumption...." *Id.; see* Restatement § 261, cmt. b. Finally, relief will not be granted if it may be inferred from either the language of the contract or the circumstances that the risk of the frustrating occurrence, or the loss caused thereby, should properly be placed on the party seeking relief. Restatement § 265 cmt. b; *see* Restatement § 261 cmt. c.

Kuhn contends that the Gulf War with its attendant threats of terrorism was an "event the non-occurrence of which was a basic assumption" of the contract. The resort, on the other hand argues that these events were merely normal incidents of life in the modern world. We conclude, however, that under Restatement section 265 comment a, the parties "basic assumption" is only relevant if the other requirements listed in comment a are satisfied. Here, because we find no substantial frustration of a principal purpose entitling Kuhn to relief, we need not decide if the nonoccurrence of the Gulf war and Saddam Hussein's threats of terrorism was a basic assumption of the parties.

### B. Principal Purpose

#### 1. A Forum For European Personnel

Kuhn contends that its principal purpose in scheduling the convention was to provide a forum for its European personnel to introduce new and innovative products to its North American dealers. The resort acknowledged that the primary threat of terrorist activity was to the United States' international interests rather than domestic targets. Even if we take this as an implied concession by the resort that it was too dangerous for Kuhn's European personnel to fly to Scottsdale, Kuhn is not entitled to relief for frustration of purpose on this ground.

For Kuhn to obtain relief based on the frustration of its plans for its European employees to introduce new products, those plans must have been understood by the resort as Kuhn's "principal purpose" in entering the contract. As the court noted in *Krell,* to establish that "the object of the contract was frustrated," it must be shown that the frustrated purpose was "the subject of the contract ... *and was so to the knowledge of both parties.*" [1903] 2 K.B. at 754 (emphasis added). It is not enough that the promisor "had in mind some specific object without which he would not have made the contract." Restatement § 265 cmt. a. "The object must be so completely the basis of the contract that, *as both parties understand,* without it the transaction would make little sense." *Id.* (emphasis added). In *Krell,* for example, the "coronation procession and the relative position of the rooms [was] the basis of the contract as much for the lessor as the hirer." [1903] 2 K.B. at 751.

■ Here, Kuhn never established that *both* parties had a common understanding that Kuhn's principal purpose in entering the contract was a convention at which the European personnel would be present. First, the contract itself makes no mention of any particular purpose for the convention. Second, neither the deposition and affidavit of Timothy Harman—Kuhn's general sales manager responsible for scheduling the convention— nor the deposition of ·William Kilburg—the resort's vice president—raised any factual inference that the resort knew of Kuhn's plans concerning the European personnel. Harman's affidavit only related *Kuhn's* understanding of the purpose of the convention. The only other reference in the record to the purpose of the convention is Harman's deposition testimony that his role was to find a venue for a *North American* dealers' meeting.

In sum, although *Kuhn* thought that attendance of the Europeans was crucial to the success of the convention, the record is de-

void of any evidence that the resort contracted with that understanding. Neither does the record establish any reasonable inference that, when the parties contracted, the resort knew or had reason to know that its counterperformance—the furnishing of resort facilities—would make little sense without the presence of the Europeans. We conclude, therefore, that Kuhn's principal purpose—the attendance of the European personnel—was not so completely the basis of the contract, as understood by the resort, that without such attendance the transaction was meaningless. Accordingly, Kuhn is not entitled to relief on that theory.

### 2. Attendance Of Most Invited Personnel

Nevertheless, Kuhn argues that the parties contracted with the idea that "all or *most*" of Kuhn's employees and dealers would come to Scottsdale for the meeting. We agree that this was a principal purpose of Kuhn's contract with the resort. Nevertheless, nothing in this record establishes that the resort contracted with the understanding that all or most of Kuhn's dealers and employees would attend the convention. Kuhn's degree of success was not of primary concern to the resort. To the contrary, the resort clearly contemplated that the convention might not meet Kuhn's expectations. Not only does the contract include a provision for attrition in attendance and outright cancellation, it assigns the risk of such events to Kuhn. Thus, as with the attendance of the European employees, the attendance of all or most of Kuhn's dealers and employees was not so completely the basis of the contract, as understood by the resort, that without such attendance the transaction would make little sense.

Kuhn did establish, however, that the resort contracted with knowledge that a principal purpose of Kuhn was a convention at which *some* of Kuhn's employees and dealers would attend. If that purpose was substantially frustrated by the Gulf War, Kuhn is entitled to relief. Consequently, we next consider whether the Gulf War and Saddam Hussein's threats of terrorism substantially frustrated a convention for some of Kuhn's employees and dealers.

### C. Substantial Frustration

Kuhn argues that its purpose was effectively frustrated because air travel was unexpectedly rendered unreasonably dangerous. The resort, on the other hand, while essentially conceding that Kuhn's decision to cancel was made in good faith, contends that the general threat of terrorism was not sufficient to justify Kuhn's cancellation of the convention. We agree with the resort.

Preliminarily, as discussed above, Kuhn cannot rely on the absence of the Europeans as a basis for canceling the contract. Kuhn never established that both parties had a common understanding that Kuhn's principal purpose in entering the contract was a convention at which the European personnel would be present. Thus, in resolving this issue, we do not consider the threat posed to the *European employees traveling internationally by air.*

On the other hand, the threat to *domestic* air travel is a relevant consideration. Most of those invited to the convention resided in the United States and in Canada. Furthermore, the resort did not controvert Kuhn's assertion in its statement of facts that "the parties assumed that Kuhn personnel could and would travel to Scottsdale." Consequently, if the Gulf War effectively precluded domestic air travel, Kuhn could not have hosted a convention attended by even some of its dealers and employees. Under such circumstances, the resort's furnishing of its facilities would have been rendered valueless to Kuhn. We could then say that Kuhn's purpose in entering the contract was substantially frustrated. We conclude, however, that the contrary is true.

We begin our analysis on this point with the proposition that substantial frustration means frustration "so severe that it is not fairly to be regarded as within the risks ... assumed under the contract." Restatement § 265 cmt. a. Furthermore, "it is not enough that the transaction has become less profitable for the affected party or even that he will sustain a loss." *Id.* The value of the counter-performance to be rendered by the promisee must be "totally or nearly totally destroyed" by the occurrence of the event. *Lloyd*, 153 P.2d at 50.

■ Here, the conduct of Kuhn and its dealers clearly demonstrates that the value of the resort's counter-performance—the furnishing of its facilities for Kuhn's convention—was not totally or nearly totally destroyed by terrorist threats. In late January, after the United States attacked Iraq and when the threat of terrorism was at its highest level, Kuhn implicitly confirmed the convention date by reducing the reserved room block from 190 to 140. Furthermore, although several dealers canceled in early February, the uncontroverted record demonstrates that over one hundred dealers registered for the convention after the commencement of Operation Desert Storm on January 16, 1991. Thus, the frustration was not so severe that it cannot fairly be regarded as one of the risks assumed by Kuhn under the contract.

Kuhn argues, however, that even if the jointly understood purpose in holding the convention was not substantially frustrated by the actual risk of terrorism, it was entitled to cancel the convention because of its *perception* of a serious risk to air travel. For this proposition, Kuhn relies primarily on the wartime shipping cases. *See North German Lloyd (Kronprinzessin Cecilie) v. Guaranty Trust*, 244 U.S. 12, 37 S.Ct. 490, 61 L.Ed. 960 (1917); *The Styria v. Morgan*, 186 U.S. 1, 22 S.Ct. 731, 46 L.Ed. 1027 (1902); *The Wildwood v. Amtorg Trading Corp.*, 133 F.2d 765 (9th Cir.1943).

These cases, however, are not frustration of purpose cases. The wartime shipping cases are the source of the rules governing impossibility or impracticability of performance in the original Restatement of Contracts ("First Restatement") section 465 (1932). *See* Restatement § 261 reporter's note, at 323 (citing *Kronprinzessin Cecilie* as basis of doctrine). This doctrine, referred to by the First Restatement as "apprehension of impossibility," was followed by the Supreme Court of Alaska in *Northern Corp. v. Chugach Electric Ass'n*, 518 P.2d 76, 81 n. 10, *vacated on other grounds*, 523 P.2d 1243 (Alaska 1974), cited by Kuhn, and was subsequently incorporated into comment d of Restatement section 261. *See* Restatement § 261 reporter's note, at 322–23.

The wartime shipping cases essentially held that a ship captain is entitled to take reasonable precautions, including abandoning the voyage, in the face of a reasonable apprehension of danger. Read together, they establish that the promisor's decision not to perform must be an objectively reasonable response to an extraordinary, specific, and identifiable threat. *See Kronprinzessin Cecilie*, 244 U.S. at 20–24, 37 S.Ct. at 490–492 (German passenger ship justified in turning back from voyage to England on the day the German Emperor declared war (World War I)); *The Styria*, 186 U.S. at 9, 22 S.Ct. at 734 (during Spanish–American war, "reasonable prudence" justified cancellation of voyage within sight of Spanish coast with a cargo of sulfur where captain knew men-of-war were ordered to interdict sulfur); *The Wildwood*, 133 F.2d at 768 ("reasonable apprehension" of "actual and substantial" danger of running a World War II naval blockade justified cancellation of ship's voyage in light of the seizure of a ship carrying identical cargo to the same destination).[4] The degree of danger is judged in light of the facts available at the time, First Restatement section 465 comment b, but "[m]ere good faith ... will not excuse" cancellation of performance. *The Styria*, 186 U.S. at 10, 22 S.Ct. at 734.

■ Assuming solely for the purposes of argument that the above authorities cited by Kuhn are applicable to frustration of purpose, they do not help Kuhn. Even though Kuhn canceled the convention in good faith, under the cited authorities Kuhn's cancellation did not excuse its performance of the contract with the resort. Press reports in circulation at the time Kuhn canceled the convention indicated that the risk to *domestic* air travel was slight. Moreover, the United States government announced that it was taking measures to insure the safety of domestic air travel and that travelers should not be put off by the threat of terrorist activity.

Furthermore, the record establishes that by the time Kuhn canceled the convention, the risk of terrorism, if any, was diminishing. First, the danger, publicized since October

---

4. Our conclusion that the proper standard is an objective one is supported by the First Restatement section 465, cited by Kuhn: "In determining whether a promisor's failure to [perform] is reasonable ... consideration is given to ... the degree of probability, apparent from what he knows or has reason to know, ... of physical or pecuniary harm or loss to himself or to others...." *See also* First Restatement § 465 cmts. b, c.

1990, had failed to materialize. Second, Kuhn itself recognized that even its French employees could possibly travel as early as April. Finally, even after the commencement of Operation Desert Storm, more than 100 of Kuhn's dealers expressed their willingness to travel to Scottsdale.

We conclude that Kuhn's cancellation of the convention because of the perceived threat of terrorism was not an objectively reasonable response to an extraordinary and specific threat. The slight risk to domestic air travel by vague threats of terrorism does not equate with the actual and substantial danger of running a naval blockade in time of war. Consequently, Kuhn gains nothing by recasting its frustration of purpose argument as one of "apprehension of impossibility."

Finally, we consider whether Kuhn is entitled to relief on the ground that fear of terrorist activities resulted in less than expected attendance, which in turn made the convention uneconomical. Although economic return may be characterized as the "principal purpose" of virtually all commercial contracts, mere economic impracticality is no defense to performance of a contract. *See* Restatement § 265 cmt. a. ("it is not enough that transaction has become less profitable for affected party or even that he will sustain a loss"); *see also B.F. Goodrich Co. v. Vinyltech Corp.,* 711 F.Supp. 1513, 1519 (D.Ariz. 1989) (applying Arizona law); *See Louisiana Power & Light Co. v. Allegheny Ludlum Indus.,* 517 F.Supp. 1319, 1324 (E.D.La. 1981). Thus, although the Gulf War's effect on the expected level of attendance may have rendered the convention uneconomical, Kuhn was not on this ground relieved of its contractual obligation.

## V. PROCEDURAL DISPOSITION

The only issues raised by Kuhn in its response to the resort's motion for summary judgment on liability were its claims for relief under the doctrines of impracticability of performance and frustration of purpose. Because we conclude that Kuhn is not entitled to relief under these doctrines, partial summary judgment must be granted to the resort. *See Anderson v. Country Life Ins. Co.,* 180 Ariz. 625, 628, 886 P.2d 1381, 1384 (App. 1994). Consequently, we need not consider

the resort's claim that the trial court erred in denying both the resort's motion to strike certain evidence and its motion for reconsideration in light of new evidence.

## VI. CONCLUSION

We conclude that Kuhn is not entitled to relief from the contract under either the doctrine of impracticability of performance or the doctrine of frustration of purpose. Accordingly, we reverse the judgment in favor of Kuhn, order that partial summary judgment on the issue of liability be entered in favor of the resort, and remand for further proceedings consistent with this decision.

Finally, we grant the resort attorneys' fees on appeal subject to compliance with Rule 21(c), Arizona Rules of Civil Appellate Procedure.

FIDEL, P.J., and GERBER, J., concur.